**Richard L. CARMICAL, Petitioner,**

v.

**Walter E. CRAVEN, Warden, California State Prison, at Folsom, Respondent.**

**No. 52246.**

United States District Court,
N. D. California.

July 9, 1970.

Charles Stephen Ralston, Oscar Williams, San Francisco, Cal., Judith Ann Ciraolo, Oakland, Cal., for petitioner.

Thomas C. Lynch, Atty. Gen. of the State of California, Derald E. Granberg, Gloria F. DeHart, Deputy Attys. Gen., for respondent.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

GERALD S. LEVIN, District Judge.

Petitioner was convicted and sentenced on November 4, 1966, by the Superior Court in Alameda County, California, for violations of California Health & Safety Code § 11500 (possession of heroin) and California Penal Code § 12021 (convicted felon in possession of a firearm). He petitioned this Court for a writ of habeas corpus and on January 22, 1970, this Court issued an Order to Show Cause. Petitioner bases his petition upon two grounds:

*First,* that the "clear thinking" test used in the screening of prospective jurors at the time of petitioner's trial "was a gross discrimination along racial, economic and cultural grounds," and *Second,* that the evidence used to convict petitioner was obtained as a result of an illegal search and seizure made in the course of an arrest, which arrest was unlawful because of lack of probable cause for the arrest.[1]

### The Test Used to Screen Prospective Jurors

At the time of petitioner's trial in 1966, a clear thinking test was used to select a master jury panel from the voter registration lists. This test consisted of twenty-five multiple-choice questions which had to be answered in ten minutes. In order to qualify for the master jury panel prospective jurors were required to give correct answers to at least 80 per cent of the questions.

The jury for petitioner's trial was drawn from this master jury panel. Petitioner, a Negro, claims that this clear thinking test excluded a disproportionate number of Negroes and low income persons. In People v. Craig,[2] adjudicated subsequent to the trial of petitioner, the Court considered this test as used to screen prospective jurors and found that it excluded a disproportionate number of Negroes and persons of low economic income. The expert testifying in that case expressed the opinion that the test had a tendency to exclude people from the ghettoes because of "inadvertent discrimination." The Court did not hold this test to be unconstitutional or unfair but merely directed the Jury Commissioner to summon a panel of jurors "in a manner consistent with this decision."

Assuming that this test excluded proportionately more Negroes and more persons of low economic income as compared to persons in middle or upper income classes, there is no evidence or showing that there was any purpose to exclude a disproportionate number of Negroes or low income persons. Furthermore, this test was administered equally to all persons regardless of race or income.

In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court affirmed petitioner's conviction despite his allegation of racial discrimination in the selection of jurors. While Negroes constituted 26% of the males over 21 in that county, only 10% to 15% of the grand and petit jury panels were Negroes. Alabama law required the jury commissioners to place on the jury roll all male citizens in the community over 21 who are reputed to be honest, intelligent men and are esteemed for their integrity, good character and sound judgment. The Court found that in practice the commissioners do not place on the jury roll all such citizens, either white or Negro. The Court referred to this jury selection procedure and held (pp. 208–209, 85 S.Ct. pp. 829–830):

> Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. * * * There is no evidence that the commissioners applied

---

1. Although the court is cognizant of its obligation to make an independent determination of this ground, the court notes that this contention was passed upon by the California Court of Appeal and found to be without merit. People v. Carmical, 258 Cal.App.2d 103, 65 Cal.Rptr. 504 (1968); hearing denied by the California Supreme Court March 20, 1968.

2. The Court found in People v. Craig (Alameda County Superior Court, No. 41750, April 18, 1968) that 81.5% of the registered voters of West Oakland, who are predominantly black and of low economic income, failed the test while only 14.5% of the registered voters of Montclair, who are predominantly white and of middle or higher economic income, failed the test.

different standards of qualifications to the Negro community than they did to the white community. * * * Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race.

Accord: Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); and Thomas v. Texas, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512 (1909).

The decision in *Swain* fairly controls the contentions here. Petitioner does not have a constitutional right to have a proportionate number of his race or economic class on the jury or the master jury panel. *Swain, supra* at p. 208, 85 S.Ct. 824. The test given to Negroes was exactly the same as that given to others and it was administered and graded on equal terms with respect to all persons. Although this test may have been imperfect and resulted in excluding a disproportionate number of Negroes and persons of low economic income, this does not amount to purposeful discrimination based on race or income.

Objective criteria were used to select the members of the jury panel. The criteria were designed to test the intelligence of the prospective jurors. The Supreme Court of the United States recently has given approval of such a test. Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1969); Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1969). In *Carter* the District Court refused to invalidate the Alabama law requiring the jury commissioners to select for jury service those persons who are "generally reputed to be honest and intelligent and * * * esteemed in the community for their integrity, good character and sound judgment * * *." In affirming the judgment of the District Court, the Supreme Court said (pp. 332–333, 90 S.Ct. pp. 524–525):

It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty."

*Turner* follows *Carter* in upholding the constitutionality of the jury selection law which gives the jury commissioners the right to eliminate from grand-jury service anyone they find not "upright" and "intelligent." The distinguishing feature of *Turner* vis-a-vis the instant case is contained in the opinion of the court as follows (pp. 360–361, 90 S.Ct. p. 540):

In sum, the appellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole and of Negroes on the newly constituted jury list. They further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria. The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it.

The testimony of the jury commissioners and the superior court judge that they included or excluded no one because of race did not suffice to overcome the appellants' prima facie case. So far the appellees have offered no explanation for the overwhelming percentage of Negroes disqualified as not "upright" or "intelligent," or for the failure to determine the eligibility of a substantial segment

of the county's already registered voters.

■ There is no showing in the instant case of purposeful exclusion from jury service because of race. Negroes of low economic income were treated in the same manner as whites and members of other minority groups who are persons of low economic income. Even though the use of the clear thinking test may have resulted in a high proportion of persons of petitioner's racial and social background failing the test, that is not adequate proof that persons of petitioner's or any other race were purposefully excluded from the master jury panel in Alameda County because of the employment of the test, and it is not sufficient to demonstrate a violation of petitioner's constitutional rights.

*Petitioner's Arrest and the Search and Seizure*

Petitioner alleges that police officers searched him in the course of an arrest which was unlawful because there was no probable cause to make an arrest. The following facts are either admitted or not controverted by petitioner.

Officer Alves and Agent Woishnis were aware of the fact that petitioner had been arrested on previous occasions for using narcotics, that he had been under an investigation since 1964, and that he had been convicted of a felony in 1957. Officer Alves received a call at 2:30 P.M. on January 7, 1966, from an anonymous caller who told him that petitioner was known as "Black Richard" and that he was parked in front of 1007–45th Street in Emeryville with "more narcotics than he [could] swallow." The agent and officer proceeded immediately to the area in two cars.

After they had "staked-out" 1007–45th Street for two hours, petitioner came out and walked toward a 1957 Cadillac sedan parked in front. Agent Woishnis had previously observed petitioner in that vehicle. Petitioner opened the car door and sat behind the wheel with the door ajar. He then stepped out of the car and looked over the top toward two other persons coming from the porch. Agent Woishnis, communicating by radio, told Officer Alves that they should now go and talk with petitioner. Agent Woishnis drove his car and slowed it down for a stop as it passed petitioner. As the car was slowing for a stop Agent Woishnis observed petitioner pulling what appeared to be a pistol in a holster from his waistband. Agent Woishnis immediately jumped from his car and ran toward petitioner, and as he did he saw petitioner put the pistol on the car seat.

Meanwhile, Officer Alves had parked his car and was walking toward petitioner who was standing beside his car talking with the persons on the porch. When Officer Alves was about ten feet away, petitioner brought into view his right hand holding an object which appeared to be a pistol and a holster. Petitioner then made a movement as if to throw something into the car.

Agent Woishnis placed petitioner under arrest and immediately "patted him down." In the left front pocket of petitioner's trousers Agent Woishnis found a balloon containing a powder which he believed to be heroin and that is what it subsequently turned out to be. Officer Alves took the loaded pistol and holster from the car.

At the trial Agent Verbrugge testified that about a month prior to this arrest he conversed with petitioner concerning a sale of heroin by petitioner.

■ A police officer may in appropriate circumstances and manner approach a person for purposes of investigating suspected criminal behavior even though there is no probable cause to make an arrest. Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Lowe v. United States, 407 F. 2d 1391, 1394 (9th Cir. 1969). The actions by Agent Woishnis and Officer Alves in approaching petitioner in order to talk with him about possible criminal behavior were lawful.

■■ An arrest by officers can be supported by their reasonable cause to believe that a felony was being committed in their presence. Rios v. United States, 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Morales v. United States, 344 F.2d 846 (9th Cir. 1965). In the present case petitioner was not arrested until the officers had seen him place a pistol on the seat of his car. This together with their knowledge that he had been convicted of a felony was sufficient to justify the officers' belief that a felony was being committed in their presence.[3] Consequently, the arrest of petitioner was lawful.

■■ The search of petitioner's person was lawful because it was "incident to a lawful arrest." Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The Court is of the opinion that Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) is not applicable here,[4] but even if it were, the search of petitioner would be lawful because it was in an area "within his immediate control" as defined by that case.

■ After arresting petitioner the officers seized the pistol from the seat of the car and in the trunk of the car they found a raincoat with a balloon containing milk sugar in one of the pockets. The warrantless search and seizure of this evidence is lawful under the circumstances because there was probable cause and because the car could have been removed quickly from the locality or jurisdiction in which the warrant would have been sought, or the evidence could have been removed from the car and destroyed or concealed. Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Call v. United States, 417 F.2d 462, 465–466 (9th Cir. 1969); and Travis v. United States, 362 F.2d 477 (9th Cir. 1966).

Accordingly, it is hereby ordered as follows: the petition for a writ of habeas corpus is denied; the order to show cause is discharged and the proceeding is dismissed.

---

3. Cal.Pen.Code § 12021 provides in part as follows:

    Any person who is not a citizen of the United States and any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or country * * * is guilty of a public offense. * * *

4. The rule of *Chimel* does not apply to searches conducted before June 23, 1968, the date of the *Chimel* decision. Heffley v. Hocker, 420 F.2d 881 (9th Cir. 1969); Williams v. United States, 418 F.2d 159 (9th Cir. 1969).