457 F.2d 582
 Richard L. CARMICAL, Petitioner-Appellant,
v.
Walter E. CRAVEN, Warden, California State Prison at Folsom,
Respondent-Appellee.
 No. 26236.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 4, 1971.
Rehearing Denied May 10, 1972.
 
 William Bennett Turner (argued), Oscar Williams, San Francisco, Cal., Judith Ann Ciraolo, Oakland, Cal., Jack Greenberg, Charles Stephen Ralston, New York City, for petitioner-appellant.
 Gloria F. DeHart, Deputy Atty. Gen., (argued), Evelle J. Younger, Cal. Atty. Gen., Derald E. Granberg, Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.
 Before BARNES, HAMLEY and HUFSTEDLER, Circuit Judges.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 Appellant Carmical appeals from an order denying his petition for a writ of habeas corpus. His petition charged that his state court conviction was invalid because he was tried by a jury drawn from a jury panel unconstitutionally selected.
 
 
 2
 Before we discuss the merits of the petition, we dispose of appellee's contention that Carmical had waived his jury discrimination claim by his failure to raise the question at the time he was tried in the state court in November 1966. The state court record contains no indication of any affirmative act on Carmical's part evidencing his deliberate rejection of his constitutional guaranty. (McNeil v. North Carolina (4th Cir. 1966) 368 F.2d 313, 315.) There is nothing in either the state court proceedings or the record below suggesting that Carmical's attorney declined to raise the issue for some strategic purpose. As the district court, 314 F.Supp. 580, impliedly found, the ingredients for deliberate bypass specified in Fay v. Noia (1963) 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, are lacking, and the issue is not foreclosed on collateral attack. (Cobb v. Balkcom (5th Cir. 1964) 339 F.2d 95; cf. Fernandez v. Meier (9th Cir. 1969) 408 F.2d 974.)
 
 
 3
 For the purpose of testing the sufficiency of Carmical's averments, prima facie, to sustain his claim for habeas relief, the appellee admitted the truth of the matters set forth in the petition and exhibits filed in support of it. The petition and the exhibits include the following facts: Carmical was tried and convicted for possessing heroin and for illegally possessing a firearm. At the time of his trial in Oakland, California, Oakland used a "clear thinking" test to select a master jury panel from the voter registration lists. The test purportedly winnowed voters of below "ordinary intelligence," leaving only those who satisfied California's statutory commandment that a juror be "[i]n possession of his natural faculties and of ordinary intelligence and not decrepit." (Cal.Civ.P.Code, Sec. 198(2) (West 1954).) The test consisted of 25 multiple-choice questions which had to be answered in 10 minutes. Prospective jurors were not told about the time limit before they took the test. To qualify for the master jury panel, prospective jurors were required to give "correct" answers to at least 80 percent of the questions.[1]
 
 
 4
 The use of this test excluded a substantial majority of otherwise eligible minority and low income persons from the master jury roll. In the second half of 1967, 81.5 percent of registered voters from predominantly black and low income areas of Alameda County who took the test failed to pass it. In contrast, only 14.5 percent of those eligible jurors from predominantly white areas taking the test failed to pass it. A total of 29 percent of all persons tested failed the examination. At the time of Carmical's prosecution in 1966, registered voters from predominantly white areas were nearly four times as likely to pass the test as were voters from black and low income areas.
 
 
 5
 A psychologist who is an expert on reliable testing methods declared by affidavit that: (1) the test contained many administrative flaws; (2) the high failure rate indicated that the test was excluding persons of ordinary intelligence; and (3) certain questions measured cultural rather than intelligence factors.
 
 
 6
 In 1968, the Superior Court for the County of Alameda prohibited further use of the test because it separated examinees on some basis other than "ordinary intelligence."[2]
 
 
 7
 The facts accepted as true for purposes of this appeal established a prima facie case of class exclusion from the jury selection process. In Whitus v. Georgia (1967) 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599, jurors were selected from tax digests previously maintained on a segregated basis. Blacks constituted 27.1 percent of persons potentially eligible for jury service. Only 9.1 percent of the grand jury venire and 7.8 percent of the petit jury venire were blacks. There was no evidence that any of the 27.1 percent eligible black jurors were disqualified from jury service. There existed a 3-to-1 disparity between blacks eligible for jury service and those on the grand jury venire and a 3.5-to-1 disparity on the petit jury venire. Ten out of 123 persons on both venires, or 8.1 percent, were blacks, a disparity of 3.3-to-1. Here, the test excluded from jury service 81.5 percent of the registered voters from black and low income neighborhoods but only 14.5 percent of the registered voters from predominately white areas, leaving 18.5 percent of the blacks but 85.5 percent of the whites. The state offered no evidence that any voter disqualified by the test was disqualified for other reasons. The ratio of eligible black and low income persons who would be eligible for jury service if the test excluded the same percentage of them as it did whites to those placed on the master list is 4.6 to 1, a disparity greater than that condemned in Whitus.
 
 
 8
 Once Carmical has presented his prima facie case, the state must adduce evidence sufficient to rebut it. (E. g., Coleman v. Alabama (1967) 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22; Hill v. Texas (1942) 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Norris v. Alabama (1935) 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.)
 
 
 9
 The sole issue on appeal is a narrow question of law: Is proof alone that the "clear thinking" test in fact resulted in large-scale exclusion of identifiable classes of veniremen otherwise eligible for jury service sufficient to make out a prima facie case of constitutionally impermissible jury selection, or, as the state contends, must Carmical also have offered evidence that the "clear thinking" test was intentionally designed to produce that result?
 
 
 10
 The narrowness of the question does not obscure its constitutional importance. Trial by jurors selected from the broad spectrum of society is a constitutional mandate. (E. g., Carter v. Jury Commission (1970) 396 U.S. 320, 330, 90 S.Ct. 518, 24 L.Ed.2d 549; Smith v. Texas (1940) 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84.) A state may not systematically exclude persons from the jury selection process on the basis of their race, color, national origin, or on other identifiable group characteristics. (E. g., Whitus v. Georgia, supra; Hernandez v. Texas (1954) 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Strauder v. West Virginia (1879) 100 U.S. 303, 25 L.Ed. 664.) Token inclusion of members of the affected class in the selection process does not satisfy that fundamental command. (See Jones v. Georgia (1967) 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25; Whitus v. Georgia, supra; Smith v. Texas, supra.) Although petitioner is not constitutionally required to be tried by a jury including persons from his race or class or by a jury proportionately representative of the community (e. g., Swain v. Alabama (1965) 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759; Thomas v. Texas (1909) 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512), he is entitled to a jury selected from a master list drawn from the community as a whole.
 
 
 11
 It is true that almost all of the cases that have come before the Supreme Court challenging the constitutionality of jury selection systems have been cases in which the methods of selection were explicitly or implicitly designed to exclude Negroes from jury service. (E. g., Whitus v. Georgia, supra [segregated tax returns]; Eubanks v. Louisiana (1958) 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 [judges interviewed prospective jurors]; Avery v. Georgia (1953) 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 [segregated jury tickets]; Hill v. Texas, supra [jury commissioners failed to search out qualified blacks]; Smith v. Texas, supra [blacks placed last on jury list]; Bush v. Kentucky (1882) 107 U.S. 110, 1 S. Ct. 625, 27 L.Ed. 354 [blacks excluded by law]; Neal v. Delaware (1880) 103 U.S. 370, 26 L.Ed. 567 [blacks presumed incompetent to serve as jurors].) The opinions take into account the historical prevalence of intentional discrimination against Negroes, but the Court has never implied that the absence of that factor destroys a prima facie case. Rather, the Court has charged state officials with an affirmative duty to seek, and include within the jury selection process, all persons qualified under state law. As the Court stated in Avery v. Georgia, supra, 345 U.S. at 561, 73 S.Ct. at 892:
 
 
 12
 "The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure-'a course of conduct'-which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. [State of] Texas, 316 U.S. 400, 404 [62 S.Ct. 1159, 86 L.Ed. 1559] (1942). If they failed in that duty, then this conviction must be reversed-no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of 'equal protection."' (Accord, Eubanks v. Louisiana, supra, 356 U.S. at 587, 78 S.Ct. 970, quoting from Patton v. Mississippi (1947) 332 U.S. 463, 469, 68 S.Ct. 184, 92 L.Ed. 76; Cassell v. Texas (1950) 339 U.S. 282, 289, 70 S.Ct. 629, 94 L.Ed. 839.)
 
 
 13
 To support its argument that the Constitution does not forbid a system of jury selection that substantially excludes identifiable classes of prospective jurors, but only forbids systems deliberately designed to accomplish that result, the state relies on a passage from Swain v. Alabama, supra, 380 U.S. at 209, 85 S.Ct. at 830:
 
 
 14
 "Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race."
 
 
 15
 Swain will not carry the burden the state puts upon it.
 
 
 16
 The object of the constitutional mandate is to produce master jury panels from which identifiable community classes have not been systematically excluded. The object is neither to reward jury commissioners with good motives nor to punish those with bad intentions. When a jury selection system actually results in master jury panels from which identifiable classes are grossly excluded, the subjective intent of those who develop and enforce the system is immaterial. For example, in Norris v. Alabama, supra, 294 U.S. at 598, 55 S.Ct. 579, 584, the Court related testimony by jury officials that they had not considered race or color in preparing the jury roll. The Court then observed:
 
 
 17
 "If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the constitutional provision-adopted with special reference to their protection-would be but a vain and illusory requirement."
 
 
 18
 (Accord, Turner v. Fouche (1970) 396 U.S. 346, 361, 90 S.Ct. 532, 24 L.Ed.2d 567; Sims v. Georgia (1967) 389 U.S. 404, 407-408, 88 S.Ct. 523, 19 L.Ed.2d 634; Hernandez v. Texas, supra, 347 U.S. at 481-482, 74 S.Ct. 667; Smith v. Texas, supra, 311 U.S. at 131-132, 61 S.Ct. 164.) The lack of specific intent to discriminate on the part of Alameda County's jury officials cannot offset the grossly discriminatory effect of their jury selection process. (Cf. Griggs v. Duke Power Co. (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158;[3] Gaston County v. United States (1969) 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309; Gomillion v. Lightfoot (1960) 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.)
 
 
 19
 However, proof of deliberate intent to discriminate may be relevant when, as in Swain, the percentage of excluded classes is not gross enough unequivocally to establish discrimination. Evidence that the system was designed to discriminate invidiously may add enough strength to such statistical data to make out a prima facie case. In short, subjective intent may be relevant to prove that a particular system is invidiously discriminatory, but that evidence is not an element of the constitutional test.
 
 
 20
 The Fifth Circuit has squarely held that purposefulness is not an element of a prima facie case. After discussing a number of Supreme Court cases in United States ex rel. Seals v. Wiman (5th Cir. 1962) 304 F.2d 53, 65, cert. denied (1963) 372 U.S. 924, 83 S.Ct. 741, 9 L.Ed.2d 729, the court concluded:
 
 
 21
 "Those same cases, however, and others, recognize a positive, affirmative duty on the part of the jury commissioners and other state officials, and show that it is not necessary to go so far as to establish ill will, evil motive, or absence of good faith, but that objective results are largely to be relied on in the application of the constitutional test."
 
 
 22
 In Mobley v. United States (5th Cir. 1967) 379 F.2d 768, 772, the court stated:
 
 
 23
 "There is, therefore, an affirmative duty imposed by the Constitution and laws of the United States upon the jury selection officials * * * to know the availability of potentially qualified persons within significant elements of the community, including those which have been the object of state discrimination, to develop and use a system that will result in a fair cross section of qualified persons in the community being placed on the jury rolls and to follow a procedure which will not operate to discriminate in the selection of jurors on racial grounds."
 
 
 24
 (Accord, Salary v. Wilson (5th Cir. 1969) 415 F.2d 467, 472; Vanleeward v. Rutledge (5th Cir. 1966) 369 F.2d 584, 586-587.)
 
 
 25
 The state asserts that Alameda County's system operated fairly. The Supreme Court approved the use of intelligence or education as a criterion for jury service in Carter v. Jury Commission (1970) 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 and Turner v. Fouch (1970) 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567. The state says that the jury commissioner utilized the purely objective and proper standard of intelligence as indicated by the test results in preparing the master jury list and that that standard did not measure race or minority status and could not result in discrimination.
 
 
 26
 The state's argument ignores the record. For the purpose of the district court's ruling and upon this appeal, the state assumed the truth of the contents of the complaint and the accompanying affidavits. The state has thus conceded that the test did not measure average intelligence for the purpose of posing the legal issue.
 
 
 27
 In Turner v. Fouche, supra, the Court expressly disapproved the elimination of 171 blacks on the ground that they were not intelligent or upright. Although intelligence was a valid requirement for jury service, the mere assertion that a large number of blacks were not intelligent did not justify their exclusion. Because Alameda County's test did not measure intelligence, any reliance on test results is no more than an unsupported assertion that those persons excluded were not intelligent. We perceive no meaningful distinction between Turner and this case.
 
 
 28
 Moreover, the state has also assumed at this juncture that the test reflected cultural bias. The use of a test that was culturally biased and that resulted in the substantial exclusion of those classes against whom the bias existed is itself prima facie proof that the selection process violated the Fourteenth Amendment. "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race" or other identifiable minority characteristics. (Cassell v. Texas, supra, 339 U.S. at 287, 70 S.Ct. at 632.)
 
 
 29
 The order is reversed and the cause is remanded for further proceedings consistent with the views herein expressed. Upon remand, the state shall have the opportunity to disprove each of the averments that it has conceded for the purpose of the prior district court ruling and for the purpose of this appeal.
 
 
 
 [1]
 "Correct" answers were those supplied by the manufacturer of the test. We use "correct" pejoratively because we cannot describe as "right" any of the choices given for some of the questions asked. Here are three samples from the test:
 "4. Why is a man superior to a productive machine?
 
 
 [1]
 A man has a sense of humor
 
 
 [2]
 A man can think
 
 
 [3]
 A machine requires repairs."
 "23. If a person asks you for something you do not have, you should:
 
 
 [1]
 Tell him to mind his own business
 
 
 [2]
 Say you don't have it
 
 
 [3]
 Walk away."
 "25. If it rains when you are starting to go for the doctor, should you:
 
 
 [1]
 Stay at home
 
 
 [2]
 Take an umbrella
 
 
 [3]
 Wait until it stops raining."
 
 
 [2]
 People v. Craig (Super.Ct. of Alameda County 1968) No. 41750
 
 
 [3]
 In Griggs the Court struck down the use of a seemingly objective test that resulted in inadvertent discrimination, holding that Title VII of the Civil Rights Act of 1964 proscribed the use of a standardized intelligence test that was not job related and operated to disqualify a disproportionate number of black job applicants. There was no evidence that the test was adopted for a discriminatory purpose. Although the Act appeared to sanction testing methods that were not used to discriminate, the Court found from the legislative history that Congress intended to proscribe unintentional as well as intentional discriminatory hirings
 Griggs epitomizes a clearly discernible trend toward the proscription of devices that result in the disproportionate exclusion of minority groups. (See Gaston County v. United States (1969) 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309; Labat v. Bennett (5th Cir. 1966) 365 F.2d 698, 719-720, cert. denied (1967) 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334.)
 In Griggs, as well as here, the test was not related to the purpose for which it was administered. The examiners' good faith was not questioned. The resulting discrimination was conclusive.