**Larry P. et al., Plaintiffs,**

**v.**

**Wilson RILES et al., Defendants.**

**No. C-71 2270.**

United States District Court,
N. D. California.

June 20, 1972.

Oscar Williams, San Francisco, Cal., for plaintiff NAACP.

Michael S. Sorgen and Armando M. Menocal, III, San Francisco Neighborhood Legal Assistance Foundation, San Francisco, Cal., for other plaintiffs.

Evelle Younger, State Atty. Gen., and Richard Myers, Deputy Atty. Gen., San Francisco, Cal., for defendant State of California.

Ray Williamson and Thos. M. O'Connor, San Francisco City Attys., San Francisco, Cal., for local defendants.

## ORDER and MEMORANDUM

PECKHAM, District Judge.

Plaintiffs in this case have asked the Court to issue a preliminary injunction restraining the San Francisco Unified School District from administering I.Q. tests for purposes of determining whether to place black students in classes for the educable mentally retarded. Named plaintiffs, who remain anonymous for their own protection, are black San Francisco elementary school children who

have been placed in EMR (Educable Mentally Retarded) classes because, *inter alia*, they scored below 75 on the defendant School District's I.Q. tests. They claim that they are not mentally retarded, and that they have been placed in EMR classes on the basis of tests which are biased against the culture and experience of black children as a class, in violation of their fourteenth amendment rights. In fact, plaintiffs have presented evidence, in the form of affidavits from certain black psychologists, that when they were given the same I.Q. tests but with special attempts by the psychologists to establish rapport with the test-takers, to overcome plaintiffs' defeatism and easy distraction, to reword items in terms more consistent with plaintiffs' cultural background, and to give credit for non-standard answers which nevertheless showed an intelligent approach to problems in the context of that background, plaintiffs scored significantly above the cutting-off point of 75.

Irreparable injury is alleged to flow from plaintiffs' placement in EMR classes because the curriculum is so minimal academically, teacher expectations are so low, and because other students subject EMR students to ridicule on account of their status. Furthermore, EMR students allegedly acquire severe feelings of inferiority. *See* affidavit of Harold E. Dent, Thomas O. Hilliard, William D. Pierce, and Gerald I. West, Ph. D.'s. To add to this alleged irreparable harm, the fact of placement in EMR classes is noted on a student's permanent school record, for colleges, prospective employers, and the armed forces to see. Plaintiffs charge that the harm is especially great because under state law placement in EMR classes is reevaluated only once every three years; this law was recently changed, however, to require reevaluation yearly. Calif.Educ. Code § 6902.4.

Defendants justify the EMR program by noting that the curriculum, pace, and increased attention available in its classes are designed to be beneficial to retarded students, and that in San Fran-

cisco the classes are labelled "ungraded" or "adjustment" in order to minimize any stigma. *See* affidavit of Martin Dean, Assistant Superintendent for Special Educational Services for the San Francisco Unified School District. However, defendants do not seem to controvert plaintiffs' assertion that a student who does not belong in an EMR class is harmed by being placed there. Rather, defendants claim that since students are permitted to achieve their way out of EMR classes on the basis of yearly evaluations, plaintiffs can be suffering only negligible harm as a result of their placement in such classes, even if it is true that they are not mentally retarded. The Court finds this contention to be specious. For even if a student remains in an EMR class for only one month, that placement is noted on his permanent record, his education is retarded to some degree, and he is subjected to whatever humiliation students are exposed to for being separated into classes for the educable mentally retarded.

This Court is thus of the view that for those students who are wrongfully placed in EMR classes, irreparable harm ensues. The more troublesome question, however, is whether some students, including named plaintiffs, are in fact being wrongfully placed in such classes, in violation of their constitutional rights.

## NATURE OF PLAINTIFFS' CLAIM

Plaintiffs contend that they are being deprived of equal protection of the laws. In order to establish a prima facie case that such a constitutional violation has occurred, plaintiffs claim that they need only demonstrate that the method of classification being used by defendants (the I.Q. test), although not one based explicitly on race, nevertheless leads to a racial imbalance in the EMR classes. Thus, they reject the traditional equal protection test, which states that the burden is on the plaintiff to prove that no rational relationship exists between the method of classification used and the outcome of the classification. *See, e. g.,* Williamson v. Lee Optical Co., 348 U.S.

483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Instead, they assert that once their prima facie case has been made, the burden of proof shifts to defendants to demonstrate the rationality of the mode of classification.

The conceptual scheme which plaintiffs have proposed is one borrowed from cases involving employment discrimination under Title VII of the Civil Rights Act of 1964, jury selection, and school desegregation. For example, if a job qualification test is given which results in a greatly disproportionate number of blacks failing in relation to the percentage of blacks in the job-seeking community, then the burden shifts to the employer to explain how the test is valid for purposes of selecting employees. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D. Calif. 1972). Similarly, when qualification tests for jury service lead to a disproportionately low number of blacks on grand and petit juries, the burden shifts to the state to explain why passing such a test is a necessary prerequisite to being an effective juror. Carmical v. Craven, 457 F.2d 582 (9th Cir. 1971) (Hufstedler, J.). And finally, when a school district's methods for delineating school boundaries result in student bodies being predominantly of one race or another, the burden shifts to the school district to demonstrate that its methods serve valid and educationally relevant purposes. See, e. g., United States v. School District 151 of Cook County, 286 F.Supp. 786 (N.D.Ill.1968), aff'd., 404 F.2d 1125 (7th Cir. 1968).

The Court believes that this same approach should be utilized in analyzing plaintiffs' contention that the use of I.Q. tests to determine placement in EMR classes violates their right to equal protection of the laws. There are several reasons why the burden is shifted in employment discrimination, jury selection, and school desegregation cases; and all of them dictate that the same process be followed in the instant case.

First, shifting of the burden is a reflection of the strong judicial and constitutional policy against racial discrimination. Of all the evils the equal protection clause was designed to eliminate, racial discrimination is the one we are most certain the drafters contemplated. Indeed, race has been declared by the Supreme Court to be a "suspect classification"; and there is little doubt that if the San Francisco Unified School District were to classify students explicitly on the basis of race for purposes of EMR placement, it would have a near impossible burden to sustain in attempting to justify it. See, e. g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In the de facto race classification cases where the burden has been shifted, courts have manifested this same distrust of laws which harm blacks as an identifiable class. But since the classifications in these cases are not explicitly on the basis of race, these courts have lightened the burden placed on defendants, and have required defendants merely to come forward with evidence that a rational relationship exists between the seemingly neutral method of classification used and the valid purpose of the classification; they have not, as in the explicit racial classification cases, demanded that defendants provide a compelling justification for the classification.

Insofar as the cases which have shifted the burden of proof rely for their support on this general distrust of classifications which harm blacks as an identifiable group, then this Court feels compelled to shift the burden in the instant case if plaintiffs can demonstrate that the I.Q. tests are in fact the primary basis for placing students in EMR classes and that in fact there is a disproportionately high number of black students in the EMR classes. Judge J. Skelly Wright used just this justification for shifting the burden of proof in Hobson v. Hansen, 269 F.Supp. 401 (1967), a case which attacked the system of "tracking" in the Washington, D. C. school system. In Washington there were three

or four tracks, depending on the level of schooling; but in every school there was at least one track, labelled "Basic," which corresponded to the EMR classes in the instant case (e. g., assignment to the "Basic" track was based primarily on the fact of scoring lower than 75 on an I.Q. test). Black students were disproportionately represented in that track. In deciding the constitutional claim that use of the I.Q. tests violated black students' rights to equal protection of the laws, Judge Wright stated,

> [T]he law has a special concern for minority groups for whom the judicial branch of government is often the only hope for redressing their legitimate grievances; and a court will not treat lightly a showing that educational opportunities are being allocated according to a pattern that has unmistakable signs of invidious discrimination. Defendants, therefore, have a weighty burden of explaining why the poor and the Negro should be those who populate the lower ranks of the track system.

269 F.Supp. at 513.

A second reason for shifting the burden of proof in de facto racial classification cases has been the existence of a positive duty to avoid racial imbalance in certain of our institutions. Thus the justification for doing so in jury selection cases is the fact that the Supreme Court "has charged state officials with an affirmative duty to seek, and include within the jury selection process, all persons qualified under state law." Carmical v. Craven, 457 F.2d 582, 586 (9th Cir. 1971). While this legal duty does not demand that each jury exactly reflect the racial breakdown of the community, it does establish a sufficiently strong policy in favor of representative juries that the burden of proof must be shifted to the defendants when a method of jury selection leads to a significant racial imbalance in jury composition. Similarly, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), advanced a strong policy in favor of equal educational opportunity in its statements about the importance of a good education to advancement and well-being in our society. While this policy does not necessarily dictate a racial balance in each school exactly reflecting the racial make-up of the community, it does warrant shifting the burden of proof in school desegregation cases as well as in cases like the present one where a method of classification allegedly leads students of one race to be more likely to receive an inferior education.

A third rationale for shifting the burden of proof is the one which seems to underly the employment discrimination cases. In such cases there seems to be an empirical assumption that for most unskilled or semi-skilled jobs, an ample pool of qualified or potentially qualified workers of both races exists; and if racial imbalance in the workforce nevertheless occurs, it is likely to be the consequence of racial discrimination. The analogous assumption in the instant case would be that there exists a random distribution among all races of the qualifications necessary to participate in regular as opposed to EMR classes. Since it does not seem to be disputed that the qualification for placement in regular classes is the innate ability to learn at the pace at which those classes proceed (see Response 1.11 of Martin J. Dean, Assistant Superintendent for Special Educational Services, to Questions Submitted by the Association of Black Psychologists), such a random distribution can be expected if there is in turn a random distribution of these learning abilities among members of all races.

Defendants herein have not embraced any notion that inherited differences in intelligence exist among the races. They have suggested that since black people tend to be poor, and poor pregnant women tend to suffer from inadequate nutrition, it is possible that the brain development of many black children has been retarded by their mothers' poor diet during pregnancy. No affidavits have been presented to this Court substantiating this conclusion, however, or even explaining the alleged connection between

the eating habits of pregnant mothers and the intelligence of their offspring. Since the Court cannot take judicial notice of such matters, there can be no basis for assuming otherwise than that the ability to learn is randomly spread about the population.[1]  And hence another reason exists for shifting the burden of proof to defendants in the instant case to justify the use of intelligence testing.

◼ Accordingly, this Court is of the opinion that if plaintiffs can demonstrate that the I.Q. tests challenged herein are the primary determinant of whether a child is placed in an EMR class, and that racial imbalance exists in the composition of such classes, then the burden must shift to the defendants to demonstrate the rational connection between the tests and the purpose for which they allegedly are used.  The fact of racial imbalance is demonstrated by plaintiffs' undisputed statistics, which indicate that while blacks constitute 28.5 per cent of all students in the San Francisco Unified School District, 66 per cent of all students in San Francisco's EMR program are black.  Statewide, the disproportion is similar.  Blacks comprise 9.1 per cent of all school children in California, but 27.5 per cent of all school children in EMR classes.  Certainly these statistics indicate that there is a significant disproportion of blacks in EMR classes in San Francisco and in California.

Having concluded that racial imbalance exists in the EMR classes, this Court must then determine whether the result of an I.Q. test forms the principal basis for a decision to place a child in an EMR class.  In August, 1971, a new scheme for selecting students for EMR classes was instituted state-wide by the California Legislature.  Also in August of that year, the California Department of Education issued a Special Education Memorandum establishing policies and procedures for "the identification, assessment, and placement of minors" in EMR programs, in order to implement the new sections of the Education Code.  These new laws require the administration of I.Q. tests after a student has been referred to a counsellor by his teacher because he has demonstrated "a general pattern of low academic achievement, mal-adaptive or immature behavior, poor social relationships, and consistently low standardized test scores."  No tests may be given, however, unless there is parental consent, after an explanation by the school psychologist of the nature and purpose of the tests.

I.Q. test results, however, are not the only basis for determining whether the student is to be placed in an EMR class.  Section 6902.085 of the Education Code states,

No minor may be placed in a special education program for the mentally retarded * * * unless a complete psychological examination by a credentialed school psychologist investigating such factors as developmental history, cultural background, and school achievement substantiates the retarded intellectual development indicated by the * * * individual test scores.  This examination shall include estimates of adaptive behavior.  Until adaptive behavior scales are normed and approved by the State Board of Education, such adaptability testing shall include, but is not limited to, a visit, with the consent of the parent or guardian, to the minor's home by the school psychologist or a person designated by the chief administrator of the district, upon the recommendation of the school psychologist, and interviews of members of the minor's family at their home.

---

1. This presumption is borne out by what scientists call the "null hypothesis"— the idea that until proved there exists no relationship between two variables. Since no proof of a relationship between race and ability to learn is before this Court, then, none should be assumed. See Note, "Legal Implications of the Use of Standardized Ability Tests in Employment and Education," 68 Colum. L.Rev. 691, 695 (1968).

The regulations elaborate on the requirement of adaptive behavior tests, specifying investigations of the child's home language skills as well as consideration of family mobility, occupational history and status of parent, sibling relationships, isolation of home, family, and child within the environment, developmental materials present in the home, and other home and environmental factors influential upon the educational process. Similarly, the regulations are very particular about the requirement of a developmental history, and provide plainly that "In order to establish mental retardation, the developmental records should reveal significant delays and/or retarded development in such behavior as walking, talking, appropriate effective responses, assumption of responsibility, obedience within the family structure, play activities, and peer relationships within the home and in the community." Such developmental measures are to be taken by means of standardized instruments.

Thus, the I.Q. test is not the only type of psychological assessment that results in the placement of a student in an EMR class; and it is stated in the regulations that "Recommendations for appropriate educational placement shall be made after a full review of all the information available on the minor." In addition, the statute provides that no student may be placed in an EMR class without the consent of his parent or guardian, and that no parental consent shall be obtained until the parent is given an exact description of the special education program and is informed that the program is for pupils who have retarded intellectual development.

Is it to be concluded, then, that the I.Q. test is but one criterion among many leading to placement of students in EMR classes, and not a very important criterion at that? When Judge Wright was faced with a similar contention in Hobson v. Hansen, *supra*, he rejected it because 1) the School District's official criteria showed a heavy emphasis on test results; 2) the track system's operation demanded reliance on test scores so that

it could have a uniform measure of students' ability; and 3) the tests helped educators discharge the awesome responsibility of predicting a student's maximum educational potential. 269 F. Supp. at 475. In addition, Judge Wright noted prominently that the I.Q. test results could influence other criteria which were used in deciding track placement, such as teacher evaluation. At one point he stated,

> Studies have found that a teacher will commonly tend to underestimate the abilities of disadvantaged children and will treat them accordingly—in the daily classroom routine, in grading, and in evaluating these students' likelihood of achieving in the future. The horrible consequence of a teacher's low expectation is that it tends to be a self-fulfilling prophecy. The unfortunate students, treated as if they were subnormal, come to accept as a fact that they *are* subnormal . . . . A noted expert, Professor Kenneth Clark, has summed up the problem thusly:
>
> "* * * When a child from a deprived background is treated as if he is uneducable because he has a low test score, he becomes uneducable and the low test score is thereby reinforced. . . ."

269 F.Supp. at 484.

In the instant case, there is also evidence in the record to indicate that the San Francisco Unified School District places substantial emphasis on I.Q. test results. Such evidence includes the statement in the recently enacted Education Code that a child will not be placed in an EMR class unless other evidence "substantiates" the I.Q. test scores, a statement which suggests that the I.Q. score is the primary standard. Furthermore, there is evidence in the instant record that I.Q. test scores influence teacher evaluation in the same way that Judge Wright noted in Hobson v. Hansen. In their brief in support of the motion for a preliminary injunction, plaintiffs cite a well-known article, Rosenthal and Jacobson, Pygmalion in the Classroom (1968),

which demonstrates experimentally that teacher and student expectations—and therefore student performance—are influenced by knowledge of I.Q. test results. Plaintiffs also quote extensively from the Examiner's Manual for the Lorge-Thorndike group test (used in most California schools), which explains the various ways in which a pupil's expected level of performance may affect the teacher's judgments or actions. *See also* affidavits from Harold E. Dent, Ph. D., et al., and from Edward M. Opton, Jr., Ph.D.

Thus, the fact that adaptive behavior tests and teacher evaluations are considered in conjunction with I.Q. test scores in determining whether to place a child in an EMR class need not preclude the finding that I.Q. test scores loom as a most important consideration in making assignments to EMR classes. Defendants' contention that I.Q. tests are not responsible for the racial imbalance in EMR classes because parental consent is a necessary prerequisite to placement in such classes can be analyzed similarly. Clearly, if fully-informed parental consent is sought in every case, plaintiffs have nothing to complain of. However, parents are likely to be overawed by scientific-sounding pronouncements about I.Q.; and if their decisions whether to provide their consent are so colored by I.Q. results, then the I.Q. tests again appear as the prime determinants of EMR placement. Furthermore, if the I.Q. tests are found in fact to be biased against the culture and experience of black children, any consent which is obtained from the parents of such children absent communication of full information to that effect is not effective consent.

This Court is left to conclude, then, that all the prerequisites to shifting the burden of proof to the defendants to justify the use of I.Q. tests are present in this case. What facts can they muster in defense of that means of classification? Defendants do not seem to dispute the evidence amassed by plaintiffs to demonstrate that the I.Q. tests in fact are culturally biased. Indeed, defendants have stated that they are merely awaiting the development of what they expect will be a minimally biased test. This test currently is being standardized; but the final product is not expected to be available for more than a year.

Instead of denying the bias inherent in the I.Q. tests, defendants argue either that the tests are not the cause of the racial imbalance in EMR classes, or that the tests, although racially biased, are rationally related to the purpose for which they are used because they are the best means of classification currently available. Their attempts to explain the racial imbalance as the result of location of EMR classes in predominantly black schools prior to desegregation of the San Francisco Unified School District or as the result of more white parents than black parents placing their mentally retarded children in private schools must fail for lack of substantiation in the record. And their attempts to justify use of a racially biased I.Q. test in the name of lack of alternatives must meet with similar lack of success. Admittedly, there is a strong need to treat truly mentally retarded children specially and to isolate them from regular classes. That need does not, however, justify depriving black children of their right to equal protection of the laws. Indeed, the absence of any rational means of identifying children in need of such treatment can hardly render acceptable an otherwise concededly irrational means, such as the I.Q. test as it is presently administered to black students.

At the same time, there exist alternatives which seem to the Court to be at least as useful to defendants in addressing this need. Plaintiffs have provided this Court with evidence of how the New York City and Massachusetts school systems have attempted to minimize greatly the importance of I.Q. tests. *See* letter from Vera S. Paster, Director, Washington Heights—West Harlem—Inwood Mental Health Council to Harold E. Dent, Ph.D., February 9, 1972; Mass. Regula-

tions Pertaining to Education of Certain Children, October 27, 1971. New York City relies heavily on achievement test results and teacher evaluation; group I.Q. tests have been banned there. Massachusetts requires "psychological assessment" of potential EMR students, but does not specify I.Q. testing as part of that assessment. In addition, Massachusetts has instituted an elaborate system for reviewing decisions to place students in such classes. Other alternatives include administering the I.Q. tests to black children in the same manner as I.Q. tests were administered to named plaintiffs in this case by representatives of the Bay Area Association of Black Psychologists, or instituting thoroughgoing parental consent requirements of the type suggested by Dr. Opton in his affidavit.

Accordingly, this Court concludes that defendants have not sustained their burden of demonstrating that I.Q. tests are rationally related to the purpose of segregating students according to their ability to learn in regular classes, at least insofar as those tests are applied to black students.

Plaintiffs therefore have established the prerequisites to issuance of a preliminary injunction. Earlier, this Court found that plaintiffs will suffer irreparable injury if relief is not granted. The Court has now further concluded that plaintiffs are likely to be able to establish that they have been deprived of their right to equal protection of the laws, and hence to succeed on the merits. Finally, by rejecting defendants' contention that no alternatives exist to placing students in EMR classes primarily on the basis of I.Q. tests, this Court has also impliedly found that defendants will not suffer irreparable harm if a preliminary injunction is granted. Given these findings, the granting of a preliminary injunction is warranted. Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965).

The matter of relief is somewhat complex in this case, however. Plaintiffs assert that nothing short of elimination of all culturally biased tests and immediate evaluation of black students already in EMR classes will remedy the current situation. In addition, they seek a mandatory injunction requiring the San Francisco Unified School District to supplement the education of those students who were wrongfully placed in EMR classes in the past, to compensate for any harm they may already have suffered. Furthermore, the complaint asks that the state and city defendants be required to hire minority group psychologists and consultants "to make concerted efforts that psychological assessment of black school children be conducted and interpreted by persons adequately prepared to consider the cultural background of the child, preferably a person of similar ethnic background as the child being evaluated." Finally, in order to avoid racial bias in whatever methods the defendants utilize in place of I.Q. tests, plaintiffs request that this Court establish a ratio, whereby the percentage of black students in EMR classes could exceed the percentage of black students in the school district as a whole by no more than fifteen per cent.

The Court is not now inclined to grant any of the specific forms of relief which plaintiffs seek. The portions of the prayer that ask this Court to issue a mandatory injunction are not appropriately made at this preliminary stage. Since the purpose of a preliminary injunction is to preserve the last status quo prior to the institution of litigation, preliminary relief will be granted as to future testing and future re-evaluation only. Thus black students who are currently in EMR classes may be retained there; but their yearly re-evaluations must be conducted by means which do not deprive them of the equal protection of the laws. For the same reason, no injunction will issue at this stage requiring the defendants to take affirmative action to compensate black students who have been wrongfully placed in EMR classes at some time in the past.

Until further order of this Court, however, no black student may be placed in an EMR class on the basis of criteria

which rely primarily on the results of I.Q. tests as they are currently administered, if the consequence of use of such criteria is racial imbalance in the composition of EMR classes. The Court is unwilling to be more specific in ordering relief because it believes that several alternative plans could be adopted by the defendants, all of which would be consistent with the Court's general directive. And that being the case, defendants should be provided with as much flexibility as possible in formulating a classification system which comports with constitutional requirements. The Court is particularly wary of plaintiffs' proposed ratio system, for it leaves fulfillment of the needs of retarded black students at the mercy of white parents who may decline to consent to placement of their own retarded children in EMR classes and thereby reduce the number of retarded black children who may be placed in them.

Accordingly, it is hereby ORDERED that defendants be restrained from placing black students in classes for the educable mentally retarded on the basis of criteria which place primary reliance on the results of I.Q. tests as they are currently administered, if the consequence of use of such criteria is racial imbalance in the composition of such classes.

### ORDER

The motion to dismiss or, in the alternative, for summary judgment filed by defendants Thomas Shaheen, Dr. Zuretti Goosby, David Sanchez, John Crowley, Mrs. Ernest Lilienthal, Howard Nemerovski, Alan Nichols, and Laurel Glass is hereby denied, on the grounds set forth in the Memorandum and Order filed in this case on June 21, 1972.

Defendants' further contention that this is an inappropriate case for a class action is also rejected. Pursuant to Rule 23, Federal Rules of Civil Procedure, this Court hereby determines that the instant action is properly brought on behalf of the class of all black San Francisco school children who have been classified as mentally retarded on the basis of I.Q. test results.