Richard L. **CARMICAL** et al., Petitioner-Appellants,

v.

Walter E. **CRAVEN** et al., Respondent-Appellees.

No. 74–2333.

United States Court of Appeals, Ninth Circuit.

Feb. 16, 1977.

William Bennett Turner, San Francisco, Cal., Judith Ann Ciraolo, Oakland, Cal., for petitioner-appellants.

Evelle J. Younger, Atty. Gen., Gloria F. DeHart, Deputy Atty. Gen., San Francisco, Cal., for respondent-appellees.

Before BROWNING and TRASK, Circuit Judges, and GRAY,* District Judge.

## OPINION

WILLIAM P. GRAY, District Judge:

Appellants, Richard L. Carmical, Memmon Lawrence, Jr. and Wayne Earley, appeal from a judgment of the district court denying, in a consolidated action, their respective petitions for habeas corpus. We affirm.

Each of the appellants was sentenced to confinement following criminal convictions in the Superior Court of Alameda County, California, sometime between 1956 and 1968. During that period, the names of prospective jurors were obtained by random selection from the rolls of registered voters, the number selected from each precinct being proportional to the number of registered voters in such precinct. The individuals whose names were drawn were then summoned to appear in the office of the Jury Commissioner where they were required to read and fill out a form affidavit. Some individuals were then excused after properly claiming exception or because of inability to read and complete the affidavit.

The prospective jurors that survived this process were given a "clear thinking" test, which had been created under the auspices of a special committee of judges and lawyers in furtherance of the goal of empaneling jurors that met acceptable standards of innate intelligence, integrity, judgment and reasoning ability. The test consisted of twenty-five multiple-choice questions, and the failure to answer twenty correctly within the allotted time of ten minutes would disqualify for jury duty.

In 1968, a judge of the Alameda Superior Court prohibited further use of the test, on the ground that it resulted in a disproportionate exclusion of Blacks and poor people and thus produced a jury panel that was unrepresentative of the community. (*People v. Craig* (Superior Court of Alameda County, 1968) No. 41750).

In 1969 appellant Carmical, after having exhausted his state remedies, filed in the United States District Court his petition for writ of habeas corpus, challenging his 1966 conviction because of the use of the "clear thinking" test in forming the jury panel that tried his case, contending that it had resulted in unconstitutionally gross discrimination along racial, economic and cultural lines. In support of his petition, Carmical relied largely upon the findings of the Superior Court in *Craig*. The United States District Court ruled, however, that, even assuming that the test resulted in discrimination against Blacks and persons of low economic income, ". . . there is no evidence or showing that there was any purpose to exclude a disproportionate number of Negroes or low income persons. Furthermore, this test was administered equally to all persons regardless of race or income." *Carmical v. Craven*, 314 F.Supp. 580, 582 (N.D.Cal.1970). The petition for writ of habeas corpus was accordingly denied and the proceedings dismissed.

On appeal by Carmical, the decision below was reversed, this court holding, in an opinion by Judge Hufstedler, that "When a jury selection system actually results in master jury panels from which identifiable classes are grossly excluded, the subjective intent of those who develop and enforce the system is immaterial." *Carmical v. Craven*, 457 F.2d 582, 587 (9th Cir. 1971) ("*Carmical I*"). Inasmuch as the state had conceded the alleged discriminatory effect of the test only for purposes of the appeal, the case was remanded for further proceedings.

Upon remand, the petitions of Lawrence and Earley, which raised issues identical to

---

* Honorable WILLIAM P. GRAY, United States District Judge, Central District of California, sitting by designation.

those presented in *Carmical*, were consolidated with that case.

In anticipation of the evidentiary hearing, the district court ruled that the petitioners would have the initial burden of establishing a *prima facie* case of exclusion resulting from racial considerations and that, once this was shown, the respondent (the state) would have the burden of proving the validity of the test. The hearing that ensued was very extensive and was conducted in full compliance with the mandate of this court in *Carmical I*. Following the hearing, the trial judge issued an opinion in which he discussed the evidence that had been presented and concluded therefrom that "Although this court concludes that *some* disproportion may be inferred from petitioners' evidence, the comparative test results from the small, select, racially homogeneous areas, do not establish gross and unequivocal exclusion of identifiable classes from Alameda County jury panels." The record clearly supports such conclusion.

■ Exclusion from jury service on the basis of race or financial status clearly is constitutionally impermissible. On the other hand, as the opinion of the Supreme Court in *Carter v. Jury Commissioner*, 396 U.S. 320, 332, 90 S.Ct. 518, 525, 24 L.Ed.2d 549 (1970), stated, "It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character." The problem for this case lies in determining whether the test under consideration brought about a violation of the former principle or was in furtherance of the latter.

■ The petitioners' burden, properly imposed, of making a *prima facie* showing of the alleged discrimination was made extremely difficult by the absence from the jury selection process of any document referring to race or financial net worth. The petitioners therefore sought to establish their case by means of statistical analyses pertaining to five jury panels of the twenty-five that were formed during the years that the test was administered. The study was made to determine how a total of 2,127 individuals fared in the test or in the screening process that preceded it. Of this number of prospective jurors, 1,024 came from "black, low-income" areas. Of these, 297 were rejected by the written test and 95 passed, for a failure rate of 75.8%. The remaining 1,103 of the 2,127 prospective jurors lived in "white, middle and upper-income" areas. Ninety-two of these were rejected by the test and 409 accepted, the failure rate being 18.4%.

Such evidence falls far short of a *prima facie* showing that the use of the test resulted in racial or economic discrimination with respect to prospective jurors within the general voting population of Alameda County. As the trial court pointed out, the test considered only 7% of the approximately 30,000 people called to form the five panels selected for the study. And these panels constituted only one-fifth of the twenty-five panels that were drawn during the period that the test was administered.

The study upon which the petitioners relied developed no information as to test results from any of the predominantly black areas having an educational and cultural level comparable to the predominantly white area that was tested. On the other hand, the respondent submitted evidence tending to show that a predominantly white area and a predominantly black area with comparable educational levels produced substantially the same numbers of accepted jurors between 1963 and 1968, and that a third area, in which the total population remained stable while the percentage of blacks therein substantially increased, contributed about the same numbers of jurors during the entire transition period.

The evidence submitted at the trial, including the foregoing considerations and others, led the trial court to conclude that "Educational levels, not race or economic status, were responsible for the exclusion." Although the indications are strong that it is correct, we do not go so far as to adopt

this finding. To do so would necessarily involve an evaluation of the validity and appropriateness of the test. Inasmuch as the test is no longer used, we rest our affirmance upon the absence of a *prima facie* showing that the test resulted in discrimination with respect to race or financial condition.

The judgment of the trial court is AFFIRMED.