GOVERNOR v STATE TREASURER

*AMENDED ORDER*

In the above entitled cause a request of the Governor for the certification of questions pursuant to GCR 1963, 797 having been heretofore granted on order of the Court, the cause is hereby dismissed and the opinions heretofore filed are vacated for the reason that the Court concludes that the request was improvidently granted.

/s/ THOMAS M. KAVANAGH
Chief Justice

December 14, 1973

Justices T. G. KAVANAGH and LEVIN concurring as attached.

This Court's original opinions in this matter were filed on December 29, 1972, 389 Mich 1; 203 NW2d 457 (1972). A majority of the Court, as then constituted, found that Michigan's system for financing public school education "as it existed at the commencement of this suit" was constitutionally infirm.[1]

---

[1] "In conclusion, the answer to the certified question as amended:

" 'Does the Michigan public school financing system, consisting of local, general ad valorem property taxes and state school aid appropriations, by relying on the wealth of local school districts as measured by the state equalized valuation of taxable property per student which results in substantial inequality of maintenance and support of the elementary and secondary schools, deny the equal protection of the laws guaranteed by Article I, Section 2 of the Michigan Constitution?'

is 'Yes.' The Michigan public school financing system in the way it responds to the Michigan Constitution of 1963, art 8, § 2 mandate to 'maintain and support' the Michigan public school system denies

On January 30, 1973, we granted a rehearing.

We agree that the complaint in this cause should be dismissed and the opinions heretofore filed be vacated. The matter has been fully considered at the trial level, an opinion filed. in this Court expressing the opinion of three members of the present sitting Court and one former member of this Court, and rehearing granted. It is now incumbent on us to make known our views on this matter of public importance.

I

Two questions have been certified to this Court

equal protection of the laws guaranteed by art 1, § 2 of the Michigan Constitution. Since this interpretation of art 8, § 2 and art 1, § 2 of the Michigan Constitution is dispositive of this case, the related Federal question is not considered.

"Because these are class actions, because of the great impact on school operations, because of the long lead time in tax and allocation functions and because of the complicated structure of school financing, the formulation of an order in these cases presents problems of considerable complexity.

"We have now held that the basic allocation of funds provided for in the public school financing system as it existed at the commencement of this suit denies the equal protection of the laws. However, since that time a wholly new and different allocation formula is on the books, 1972 PA 258. Whether the public school financing system with this as a component still denies equal protection of the laws has not been and is not before us.

"While there is no fair or effective way of testing and enforcing our decision with respect to the present school district taxes just levied on the school aid formula already authorized, this Court will stand ready upon adoption of a new school aid formula and before levy of school taxes to entertain, if that is in order, a petition to test the new combined public school financing system, and, if appropriate, fashion suitable orders." *Governor v State Treasurer,* 389 Mich 1, 37–38; 203 NW2d 457 (1972)

When this action was commenced the allocation of school aid money was governed by 1970 PA 100.

Before the original opinions were filed on December 29, 1972, two additional school aid allotment bills were enacted. 1971 PA 134, 1972 PA 258.

After the rehearing was granted, still another school aid allotment bill was enacted. 1973 PA 101.

under the provisions of GCR 1963, 797. There is no need to restate or reiterate the text of these questions. In substance, they inquire whether the Michigan school financing system denies "substantially equal educational opportunity" under the Equal Protection Clauses of the Michigan Constitution (Const 1963, art 1, § 2) or the Fourteenth Amendment to the United States Constitution.

Neither the evidence presented at the hearing nor the judge's findings support the legal arguments advanced against the present system of financing public education.[2]

[2] While there are enormous disparities in current operating and instructional expenditures between the school district spending the most per pupil (Oak Park, $1,427, for all current operating expenditures, including $1,109 for instructional purposes) and the districts spending the least (Ionia, $541 for all current operating expenditures, and Freesoil, $389 for instructional purposes), those are extremes.

The variation in current operating expenses between the ten highest, $1,010.95, and ten lowest districts, $717.28, ranked by state-equalized value per pupil was $293.67 per pupil and for instructional purposes between $730.87 and $537.75 for a differential of $193.12 per pupil. The variations were less pronounced between the ten highest and ten lowest districts having more than 6,000 pupils, i.e., districts of the size of the defendant districts (Bloomfield Hills with 9,365 students; Grosse Pointe 13,529, Dearborn, 20,572).

The variations between the ten highest and ten lowest districts having 6,000 to 9,999 pupils were $146.71 for all current operating expenses, and $108.90 for instructional purposes. The variations between the ten highest and lowest districts having 10,000 pupils and over were $251.67 for all current operating expenses and $174.11 for instructional purposes.

The author of a legislatively-authorized state-wide study of financing of public elementary and secondary education in Michigan and the educational opportunities available to school children, concluded that while local school districts having high revenues purchased more programs, and to some extent have more qualified and experienced teachers, there is very little evidence that dollar expenditures, per se, are closely related to achievement. Non-school factors such as environment and family of the child seem to be the leading determinants of his achievement in school.

A state-wide comparison of composite achievement and SEV/current operating expense per pupil/instructional expense per pupil, revealed a low correlation between test scores of fourth and seventh grade students and those factors. Other data also revealed a low statistical relationship between monetary inputs and achievement output.

School districts with high socio-economic status have high compos-

We are presented with generalized arguments concerning the nature of educational opportunity in this state. So that our opinion not be misconstrued, it is important to note that we are not presented with a concrete claim by either individual students or by school districts that they are suffering from particular specified educational inadequacies because of deficiencies in the school

---

ite achievement. School districts with low SES have low composite achievement. The single most important factor associated with achievement is the SES of the school district. SES appears to be a better indicator of the educational needs of a school district than SEV.

Two school districts (River Rouge and Ecorse) ranked among the highest in the state in SEV per pupil yet ranked among the lowest in the state in composite achievement. Two of the lowest SEV districts (Rock River and Mathias Township) ranked among the high districts in composite achievement.

While it is true, that "a comparison of those school districts in the upper 1/3 with those in the middle and bottom 1/3 on composite achievement indicates that, on the average, those school districts in the upper 1/3 on composite achievement have smaller class sizes, employ the most educated, most experienced teachers with the highest average salaries, have higher SEV and expenditures per pupil, lower drop-out rates and higher SES", the differences between the high 1/3 and the low 1/3 in achievement is clearly more attributable to differences in SES than to the other factors.

(a) Districts scoring high had 23.5 fourth grade students for every fourth grade teacher, while low districts had 24.2—a difference of only .7 a student; in seventh grade the difference was only .4 a student.

(b) Of the fourth grade teachers with high-scoring districts, 59% had five or more years experience, while 53% had that much experience in low scoring districts. For seventh grade, the percentages were 59% and 52% respectively.

(c) Both fourth and seventh grade teachers in high scoring districts had an average of ten years teaching experience while those in low scoring districts had an average of nine years experience.

(d) Of the fourth grade teachers in high scoring districts 27% earned more than $11,000 while 24% in low scoring districts earned that much. For seventh grade the percentages were 28% for high and 26% for low.

(e) High scoring districts had SEV per pupil slightly above $16,000. The same figure for low scoring districts was $14,000.

(f) The total difference of revenue between high and low scoring districts was $20 per pupil. High scoring districts spent $35 more for all operating expenses, including $25 more for instruction, than did low scoring districts.

financing system. Such concrete claims, when and if raised, will stand or fall on their own merits and not on account of anything we say here. In short, we are not abandoning the school children of this state to legislative whim in derogation of any judicially enforceable right to an education they may have under our Constitution.

II

When this case was initially considered a majority of the Court found it unnecessary to reach the Federal constitutional claim, holding that, in any event, the school financing system violated the Michigan Constitution. Since our grant of a rehearing, the Federal constitutional question has been settled.

In *San Antonio Independent School District v Rodriguez,* 411 US 1; 93 S Ct 1278; 36 L Ed 2d 16 (1973), the United States Supreme Court reversed a three-judge Federal District Court which had held the Texas system of financing its public schools violated the Equal Protection Clause.[3]

Like the Michigan school financing system, the Texas system relied on a combination of local ad valorem property taxes and state aid to finance its schools. Also, like Michigan, disparities in taxable resources (property values) among Texas's school districts resulted in concomitant disparities in local school tax revenues not fully alleviated by the state's contributions.

In Texas, as in Michigan, school districts with less taxable resources must tax at higher rates than districts with more taxable resources to realize the same per pupil revenue. If they impose the

---

[3] *Rodriguez v San Antonio Independent School District,* 337 F Supp 280 (WD Tex, 1972).

same tax rate as the districts with higher tax bases, the lower tax resource districts will have less revenue to provide an education for their students.

It was contended in *Rodriguez,* as here, that such a system of financing public schools invidiously discriminates against students in school districts with relatively less taxable resources. Although the United States Supreme Court conceded that there were significant inequities in the taxable resources available to school districts, it concluded that the school financing system did not violate the Equal Protection Clause.

In so concluding, the Court said that the "new" equal protection strict scrutiny standard would not be applied because the Court had concluded that the legislation did not classify individuals on the basis of a suspect criterion nor impinge upon the exercise of a constitutionally protected right. Instead, the Court applied the old "rational basis" test and found the Texas school financing system was constitutional.

Accordingly, the certified question raising plaintiffs' Federal Fourteenth Amendment claim must be answered negatively.

### III

The decision of the United States Supreme Court in *Rodriguez* does not foreclose challenges to a school financing system premised on the provisions of a state's constitution. Indeed, after *Rodriguez,* the New Jersey Supreme Court struck down that state's education financing scheme on the basis of provisions in its constitution. *Robinson v Cahill,* 62 NJ 473; 303 A2d 273 (1973). Significantly, the Court, having made that decision, with-

held decreeing any relief, stayed the effectiveness of its own order and requested argument on the question of the form of the decree. As will appear, we prefer to know where the argued contentions are likely to take us and the people of Michigan before we announce new doctrine and, thereby, undertake to make it the governing law.[4]

In considering the Michigan constitutional question, we have been reminded of the frequent past expressions of this Court that the Michigan Constitution "secures the same right of equal protection" as is secured by the Equal Protection Clause of the Fourteenth Amendment. *Fox v Employment Security Commission,* 379 Mich 579, 588; 153 NW2d 644 (1967); *Wolodzko v Wayne Circuit Judge,* 382 Mich 528, 534; 170 NW2d 9 (1969). We do not find it necessary here to determine the degree to which we follow the lead of the United States Supreme Court in analyzing an equal protection question asserted under our state Constitution.

Opponents of the present school financing system base their challenge on the disparities among local school districts in the amount of taxable resources available for financing their schools. They do not directly challenge the right of the Legislature to create a system of local school districts with a high degree of local autonomy as to

---

[4] Subsequently, the Supreme Court of New Jersey issued a per curiam opinion referring to the statement in the cited opinion that the Court desired the further views of the parties as to the content of the judgment:

"We have had the benefit of further argument. It is our view that the Court should not disturb the statutory scheme unless the Legislature fails to enact, by December 31, 1974, legislation compatible with our decision in this case and effective no later than July 1, 1975. We withhold ruling upon the question whether, if such legislation is not so adopted, the Court may order the distribution of appropriated moneys toward a constitutional objective notwithstanding the legislative directions.

"We retain jurisdiction. Any party may move for appropriate relief, before or after December 31, 1974, if new circumstances so warrant."

school operations and financing pursuant to Const 1963, art 8, § 2. Nor do they directly challenge the choice of a locally imposed property tax as the primary method of financing education.

They ask us, rather, to focus on the variations among districts in the amount of revenue, per pupil, which will be collected under a uniform tax rate. It is argued that these variations in tax "burden" unconstitutionally deprive children in districts with relatively low taxable resources of educational opportunities equivalent to those available to children in districts with greater taxable resources. Presumably this is so because their parents and other taxpayers in the districts with fewer taxable resources will have to tax themselves at a higher rate (expend more "tax effort") in order to raise a given amount of revenue.

Opponents further argue that the disparities in local taxable resources for education are a deprivation of the equal protection of the laws. Then they, as many other lawyers and judges, seek to reduce all further argument to whether "fundamental interests" and "suspect classifications" are present.

All courts agree that the function of an equal protection clause is to protect against governmental discrimination. They also agree that governmental discrimination is not of itself unconstitutional. An equal protection clause forbids only unreasonable discrimination or, pejoratively, invidious discrimination.

There are a number of reasons why the Equal Protection Clause has not historically been thought to require that all legislation be applied equally to all citizens. First, government must be able to draw reasonable distinctions among its citizens in awarding benefits and imposing burdens. Second, there is the traditional deference of

courts to the Legislature's expression of the will of the people. Third, any strictly equalitarian view of the Equal Protection Clause could not be justified historically in terms of the intention of those who drafted and ratified it. Fourth, "equality" is itself such an ephemeral concept that judicial review on an abstract "equality" standard is bound to be unmanageable.

The term "invidious" seems to characterize, in simplest terms, a classification scheme which appears to judges to discriminate on the basis of impermissible biases or prejudices and not on the basis of any legitimate legislative goals. Accordingly, classifications which discriminate against, for examples, members of racial or religious groups, against new residents of the state or against independent or minority party voters may be closely scrutinized to see whether they reflect a legitimate exercise of legislative decision making.

In deciding whether to invalidate a legislative classification or discrimination, another concern of the courts is the impact of the discrimination. If the impact impairs, for examples, the right to counsel or other procedural rights in criminal cases, the right to free exercise of religious beliefs or the right to vote, the court is more willing to strike down the Legislature's actions than the court would be in cases where the impact is less significant. Similarly, perhaps a court will more readily invalidate legislation where human rights rather than economic interests are affected.

IV

Much of the argument in this case has been directed to the question of whether the disparities in local taxable resources signify concomitant disparities in "educational opportunity", a phrase

which has not yet been defined in terms which are both sufficiently concrete to be used to compare school systems and, also, broad enough to encompass more than a tiny portion of the spectrum of opportunity exposures that some have in mind when they speak of equal educational opportunity.

There is a fundamental disagreement concerning a standard by which equal educational opportunity may be measured.

Defendant school districts have argued that educational opportunity should be evaluated in terms of "output", as measured by pupil accomplishment on certain achievement tests. The defendants have presented statistical evidence indicating that there is no significant correlation between the level of taxable resources in a given district (or the actual per pupil expenditures of the district) and the level of achievement of its students.

On the other hand, opponents of the present school financing system wish to define educational opportunity in terms of "input". Just as defendants have defined output narrowly, in terms of achievement test scores, so, too, opponents have defined input narrowly in terms of the district's available taxable resources.

Without disagreeing with either theory of defining educational opportunity—inputs or outputs— we cannot accept without criticism either of the further-narrowed definitions offered by the parties. The reduction of the sum total output to the accomplishment of the pupils on a few achievement tests would be grossly unjust to both the educators and the pupils, for education must extend far beyond the limits of verbal facility or mathematical proficiency. With respect to the input received by a school, the level of taxable resources within a district is only one of the myriad inputs into an educational system.

The foregoing discussion serves to demonstrate the complexity of the concept of educational opportunity. We will not attempt a definition.

Yet it is important in terms of the constitutional analysis to clarify the point in contention. Although lawyers and judges in this and other cases have spoken in the grand term of educational opportunity, they have been in fact discussing what concededly is only a facet of that concept— the taxable resources available to finance each child's education.

Opponents of the present system do not press for a general requirement of equality of "educational opportunity" in all or even several of its dimensions. Instead, they are seeking equality as to one factor or input of the educational process—taxable resources.

We are not presented with particular students or particular school districts alleging that they are receiving an inadequate education in some particular regard as a result of the present financing system.

## V

The wealth discrimination here significantly differs from those situations in which indigents are totally excluded from public benefits by their inability to pay. We repeat, opponents do not assert that they or any identifiable persons are educationally deprived, nor do they, in contrast with an indigent who seeks a decree alleviating his deprivation, present us with a workable and constitutional alternative to the present financing system which would improve the "educational opportunity" of students residing in low state equalized value (SEV) districts.

A rule requiring government in the distribution of benefits, such as education, to take into account and alleviate all differences in ability to pay would work a revolutionary change in the system of furnishing benefits.

Opponents contend that the discrimination in public school financing impinges upon a fundamental right of the school children of this state—a right to educational opportunity.

The *Rodriguez* Court noted that interests are not deemed "fundamental" for purposes of invoking the strict scrutiny standard of review simply on the basis of the judge's subjective evaluation of their worth.

Article 8 of the Michigan Constitution, and specifically § 2 of article 8, providing that "[t]he legislature shall maintain and support a system of free public elementary and secondary schools as defined by law", is raised as the source of substantive educational rights of school children which, allegedly, are infringed by the Michigan school financing system.

While a constitution protects against violations of its provisions prevalent when adopted as well as conditions which thereafter develop, it is not without significance that the same Michigan Constitution which contains article 8 and an equal protection clause also refers to both a system of school districts (Const 1963, art 8, § 2; art 7, § 32; art 11, § 6; art 9, § 11) and ad valorem taxation by such school districts (art 9, §§ 6, 16).

We do not find appealing the suggestion that this Court honor the obvious fact that ad valorem taxation by school districts was contemplated by our state Constitution by directing now that the entire state be reorganized into one school district or a few very large districts.

The wide disparities of taxable resources among local school districts is not a new phenomenon. It was a prevalent phenomenon long before and at the time the people adopted the new Constitution.

The gap in taxable resources between relatively wealthy and poor districts has narrowed progressively since the adoption of the 1963 Constitution. The Legislature has appropriated ever increasing amounts of money beyond the constitutionally dedicated 50% of sales tax revenues (Const 1963, art 9, § 11) for distribution to school districts on an ascending scale inverse in ratio to the SEV per pupil in the district and, thus, favoring school districts with relatively low SEVs. This legislative effort to eliminate the effect of the disparity in taxable resources of the local districts culminated a few months ago in the adoption of the Governor's recommendations in his February, 1973 Special Message to the Legislature on Education. Under the newly enacted allocation formula of the Gilbert E. Bursley School District Equalization Act of 1973:

"The sum allocated to each school district shall be an amount per membership pupil to be computed by subtracting, from $38,000.00 in 1973–74, $39,000.00 in 1974–75 and $40,000.00 in 1975–76, the district's state equalized valuation behind each membership pupil and then multiplying the resulting difference by the tax levied for purposes included in the operation cost of the district as defined in section 112, up to and including 22 mills in 1973–74, 25 mills in 1974–75 and without limitation thereafter." 1973 PA 101; MCLA 388.1121; MSA 15.1919(521).

Thus, the advantage of defendants Grosse Pointe's and Bloomfield Hills' relatively high SEV per pupil has already been eliminated, and soon even defendant Dearborn's SEV advantage will be

largely eliminated. The advantage accruing to defendants by their levying millage in excess of the 25 mills now levied by the "average" district will be eliminated in the school fiscal year beginning after the next one.[5]

Now that a low SEV will no longer be a reason for differences between districts in the number of dollars they have to spend, opponents may stress that the residents of some districts are unwilling, although financially able, and those of other districts simply financially unable, to compete with voters in wealthier districts in taxing themselves. Whether this is fact or theory remains to be shown. Even if such claims prove well founded, it does not necessarily follow that the state has failed in its obligation to the child or that the appropriate remedy is a declaration that the entire school financing system is unconstitutional.

The Constitution does not forbid disparities in wealth. It does not forbid persons residing in one taxing district from taxing themselves at a higher rate than persons residing in other districts are both willing and able to tax themselves. It does not forbid the expenditure of the relatively higher tax revenues produced for local governmental purposes, even purposes that the Legislature has an obligation to "maintain and support".

The obligation of the government, of the Legislature, to persons financially unable to obtain essential services and, specifically, to students who live in a school district unable or unwilling to provide an adequate level of educational services or opportunity is another matter, a matter not presently before us.

---

[5] The 1970–71 SEVs of the defendants were $27,429 for Bloomfield Hills, $30,744 for Grosse Pointe, and $43,019 for Dearborn. The millage levies were, respectively, 31.63, 31.30, and 25.90.

Ten districts, with less than 1% of the school population in the aggregate, had SEVs higher than $40,000.

## VI

The state's obligation to provide each child with an education can be defined either in absolute terms—an education which leaves the child with certain minimally sufficient skills or an education which meets his educational needs or one which is sufficient to allow him to function usefully in society,[6] etc.—or it can be defined relatively—an education (or an educational opportunity) equal to that received by his peers, at whatever level that may be.

---

[6] "Now, Mr. Herbert Spencer said that if we give our pupils the knowledge which 'is of most worth'—that is, the knowledge which has indispensable practical value in regulating the affairs of life—we shall at the same time give them the best possible mental training. And Mr. Bloggs (who, by the way, can read but not write) is an unconscious follower of Mr. Spencer. It may well be that our education authorities exaggerate the value of reading, writing, and arithmetic as aids to citizenship. In these days a person unable to read would be spared the experience of much that is vulgar, depressing, or injurious; a person unable to write will commit neither forgery nor free verse; and a person not well grounded in arithmetic will not engage in betting, speculation, the defalcation of accounts, or avaricious dreams of material wealth. At any rate it will not be denied that the spread of these three studies has had many evil and dubious consequences. But the practice of navigation is at the bottom of our national prosperity and safety, and has played no small part in the formation of the British character. The charge against Mr. Bloggs is that he has given his children an elementary training in the arts of this noble profession to the neglect of certain formal studies which are not essential to a virtuous, God-fearing, and useful life in the calling of their forefathers. They are unable, it is true, to read fluently the accounts of murder trials in the Sunday newspapers; they cannot write their names upon the walls of lavatories and public monuments; they do not understand the calculation of odds or the fluctuations of stocks and shares. But these acquirements may come in time. Meanwhile, as day by day they travel through the country, the skies and fields of England are their books, their excellent parents are their newspapers, and the practical problems of navigation are their arithmetic. As for writing, there is too much writing in our country as it is; and it is a satisfaction to contemplate three children who in all probability will never become novelists nor write for the papers.

"It cannot have been the intention of Nature, which fashions the flowers and fishes in such variety, that Men, the noblest works of Nature, should be all exactly alike, shaped in the same mould and fitted to the same ends." Herbert, Uncommon Law, *Rex v Bloggs*, pp 133, 136–137.

However the state's obligation is defined, no evidence has been presented that specific, significant educational inequities exist as a result of the current school financing system, let alone evidence that such inequities would be alleviated by an opinion of this Court upholding the claims urged upon us.

Instead of substantiating with evidence their claims of educational inequities and demonstrating that a decree of this Court would overcome those inequities, all have concentrated exclusively on the disparities in taxable resources among local school districts. Such disparities are, no doubt, a cause of the disparities in per pupil expenditures that now exist among school districts. Disparities in expenditures may, indeed, contribute to disparities in educational programs offered students. Eliminating disparities in taxable resources would alleviate present disparities in expenditures. But it has not been shown that eliminating disparities in expenditures will significantly improve the quality or quantity of educational services or opportunity offered to Michigan school children.

There is simply no assurance that a declaration that the present school financing system is unconstitutional would result in an educationally significant increase in services or opportunity in a substantial number of school districts with relatively low taxable resources. For all that appears, even if larger sums were to reach these districts, the new found money might be used for other purposes, such as to make deferred expenditures without any discernable increase in educational services or opportunity.

Even if part of the larger sums were available to hire "better" teachers, there is no reason to believe that a significantly greater number of the

better teachers would accept employment in districts with low SEVs or low socio-economic status (SES) in preferences to high SEV/SES districts. Obviously, factors other than money play an important role in a teacher's choice of employment, especially if one is a "better" teacher and presumably, therefore, possessing greater mobility and choice. It is even arguable that if all districts had the same amount of money to spend, the "better" teachers would gravitate, more so than now, to the higher SEV/SES districts.

While it is true that districts which spend more for education can pay higher teachers' salaries and generally offer a greater variety of programs to their students, there is continuing debate regarding the point at which the marginal return on incremental expenditures becomes educationally significant. While a system which spends $1,000 per pupil should be able to offer significantly better educational programs than one which spends $100 per pupil, the same conclusion is not necessarily true when comparing expenditures of $730.87 per pupil and $537.75 per pupil (see fn 2).

We have not been provided with nor have we discovered any *evidence* which would help us establish the point at which the marginal return in incremental expenditures becomes educationally significant. The relationship of expenditures to educational opportunity is being sharply questioned and is the topic of much current debate among educators. We would be ill-advised, at this time, to intrude our personal suppositions into this debate in what could only be, in view of our limited judicial function, a heavy-handed manner.

Even if it were made to appear that more money would eliminate constitutionally significant disparities between districts in the quantity or quality of

educational services or opportunity, the remedy need not be to discard altogether the present tax machinery. There might be a less radical alternative, such as simply requiring that funds be provided to eliminate such disparities.

We conclude that this Court could not responsibly declare the present system of financing schools unconstitutional to achieve a social goal which our decree might not achieve, and might, perhaps, even impede.

It must be apparent by now that we are of the opinion that the state's obligation to provide a system of public schools is not the same as the claimed obligation to provide equality of educational opportunity. Because of definitional difficulties and differences in educational philosophy and student ability, motivation, background, etc., no system of public schools can provide equality of educational opportunity in all its diverse dimensions. All that can properly be expected of the state is that it maintain and support a system of public schools that furnishes adequate educational services to all children.

## VII

In substance this is a tax reform case, not an educational reform case. The only clear beneficiaries of the declaration initially made by this Court, requiring, in effect, equalization of taxable resources, are those taxpayers who may benefit from whatever new tax legislation might follow our adherance to such declaration.

If the present financing system were held unconstitutional and the Legislature responded with a state-wide ad valorem school tax, among the first questions would be the amount of millage to be

levied. If the Legislature decided upon the 25 mills now levied by the average school district, the residents in all three defendant school districts, especially those residing in Bloomfield Hills and Grosse Pointe which levy over 30 mills, would benefit. Taxpayers residing in school districts levying less than 25 mills, would pay more than they now pay.

Whether a state-wide school tax levy of 25 mills would produce more or less money than the aggregate amount produced by present school district levies has not been shown. Perhaps a smaller state-wide millage levy would produce the same aggregate amount produced under the present system; perhaps a higher millage would be required. Either way, the principal beneficiary of a ruling that the present system is unconstitutional would appear to be taxpayers residing in districts presently levying relatively high millage, persons whom, it is asserted by opponents of the present system, are more affluent than those residing in districts levying lower millage. Thus, it appears that the claims urged upon us may well be regressive tax-wise.

As previously indicated, we have no information how the aggregate amount produced by a state-wide tax would be allocated, let alone how it then would be spent. The original opinion of the Court states that the Legislature may make reasonable classifications. What assurances are there that in drafting a "transitional plan" the Legislature would not grandfather some present programs? How long would it take for litigation concerning the reasonableness of the Legislature's classifications to wend its way through the courts?

The evil of the present system, according to its opponents, is the emphasis on the property tax as

the means for financing public school education. Might not residents in some school districts—especially those now paying relatively high millage, which necessarily is taxpayer voted millage (who might well pay less millage under a state-wide property tax)—seek authority to levy a local school income tax or some other tax on themselves to finance programs not funded under state allocations? Would opponents then assert that such a levy is also "suspect?"

And what if this Court were to conclude later that the Legislature may not levy a state-wide ad valorem school tax of 25 mills? This question has not been briefed or argued even though the assumption of some opponents appears to be that the state could levy such a tax. Under the circumstance that the Constitution forbids the state to levy a sales tax in excess of the present 4% (Const 1963, art 9, § 8), or to levy a graduated income tax (Const 1963, art 9, § 7), it would be well to consider the Legislature's options under our Constitution before ruling that our Constitution requires a method of taxation for the support of school districts different from the present method.

## VIII

Our response to the certified questions is:

1. On the authority of *Rodriguez,* we answer negatively the question raising a Federal Fourteenth Amendment claim.

2. It has not been shown that the Michigan financing system substantially denies students in school districts having relatively low state equalized value per pupil "equal educational opportunity". Thus, we find no discrimination violative of Michigan's Equal Protection Clause.

3. We further respond to the question posed in

the originally filed opinion (which restated the question certified to us, addressed at the hearing and in the trial judge's findings made at our request and argued in the briefs filed with us) that the Michigan Constitution does not prohibit a school district from levying taxes to support a level of expenditure for the education of students in the district beyond the level of expenditure in other districts. Nor does the Michigan Constitution oblige the Legislature to supplement the revenues the other districts are able and willing to raise to bring the level of their expenditures up to the level of the district taxing and spending the most, or, failing that, to require the higher taxing and spending districts to reduce their tax levies and expenditures to a level the other districts, as supplemented by whatever appropriations the Legislature is willing to provide, can or are willing to maintain.