**MARTIN LUTHER KING JUNIOR ELEMENTARY SCHOOL CHILDREN residing IN the GREEN ROAD HOUSING PROJECT, and those at that scattered site, low income project who are or will be eligible to attend that Ann Arbor School, including, Michael, Anthony, Gerard and Tyrone Blair, children of Annie Blair, Temkca S., Charmin, Roy, and Elisha Brownlee, children of Carrie Brownlee, Dwayne Kihilee, and Tito Brenen, children of Janice Brenen, Carolyn, Gary, Tyrone and Jacqueline Davis, children of Corine Davis, by their mothers, and Student Advocacy Center as next friends, Plaintiffs,**

**v.**

**The MICHIGAN BOARD OF EDUCATION, the Michigan Superintendent of Public Instruction, and their employees, agents and assignees in their official capacities, the Ann Arbor School District Board, the Ann Arbor School Superintendent Harry Howard, the Ann Arbor School Pupil Personnel Director Hazel Turner, Martin Luther King Junior Elementary School Principal Rachel Schreiber, and their employees, agents, and assignees in their official capacities as well as named Individual Ann Arbor public school administrative and teaching personnel in their personal capacities, Defendants.**

Civ. No. 7–71861.

United States District Court,
E. D. Michigan, S. D.

May 17, 1978.

Gabe Kaimowitz, Kenneth Lee Lewis, Michigan Legal Services, Detroit, Mich., Lamont Walton, Legal Aid of Washtenaw County, Ann Arbor, Mich., for plaintiffs.

Patrick J. Devlin, Asst. Atty. Gen., Lansing, Mich., for Michigan Bd. of Ed., et al.

John B. Weaver, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for Ann Arbor School Dist. Bd., et al.

MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

Plaintiffs are fifteen black preschool or elementary school children residing at the Green Road Housing Project in Ann Arbor, Michigan, who previously attended, are currently attending, or will be eligible to attend the Martin Luther King, Jr., Elementary School. They are suing through their mothers and the Student Advocacy Center as next friends. The Student Advocacy Center is a non-profit Michigan corporation also known as School and Community Services, Inc., with offices in Ann Arbor, Michigan. In addition to the Michigan Board of Education and the Ann Arbor School District Board the defendants include the Michigan Superintendent of Public Instruction, Harry Howard, Hazel Turner, and Rachel Schreiber. Harry Howard is the Ann Arbor School Superintendent. Hazel Turner is the Ann Arbor School Pupil Personnel Director. Rachel Schreiber is the Principal of Martin Luther King, Jr., Elementary School.

In this lawsuit the plaintiffs allege that in the process of determining the eligibility of all students for special education services pursuant to M.C.L.A. § 380.1701 *et seq.*, the defendants have failed to determine whether plaintiffs' learning difficulties stem from cultural, social, and economic deprivation and to establish a program which would enable plaintiffs to overcome the cultural, social, and economic deprivations which allegedly prevent then, in varying degrees, from making normal progress in school. Plaintiffs assert that these omissions constitute violations of (I) their civil rights protected by 42 U.S.C. §§ 1983 and 1985(3), (II) their right to the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution, (III) their right to equal educational opportunity protected by 20 U.S.C. §§ 1703(f) and 1706, (IV) their right to the benefits of federal financial assistance pursuant to 42 U.S.C. § 2000d, (V) their right to a free

education guaranteed by Article 8, Section 2 of the Michigan Constitution and M.C. L.A. § 380.1147, and (VI) their right to be free from tortious abrogation of their constitutional rights.

On September 23, 1977, this court denied plaintiffs' motions for certification as a class and for a preliminary injunction. The defendants have now moved for the dismissal of each cause of action alleged in the complaint. The defendants associated with the City of Ann Arbor have also moved for the dismissal of the Student Advocacy Center as next friend of plaintiffs. For reasons set forth more fully herein, each cause of action alleged in the complaint is dismissed with the exception of the cause of action under 20 U.S.C. §§ 1703(f) and 1706. In addition, the Student Advocacy Center is dismissed from this case as next friend.

For purposes of deciding defendants' motions to dismiss the well-pleaded allegations of the complaint will be presumed to be true. However, no attempt to give a comprehensive summary of the complaint and its appendices, constituting approximately 180 pages, will be made in this opinion. Rather, a comparatively brief summary of salient points will be sufficient. Plaintiffs are alleged to be culturally, socially, and economically deprived, an allegation which is presumed to be true for purposes of deciding this motion. Five of the fifteen named plaintiffs have been found eligible to receive special education services for the handicapped as hereinafter explained. Four of these children have actually received services. Two children have been classified as "Learning Disabled."[1] Two children have been classified as "Emotionally Impaired." The mother of the fifth child, who is also the mother of one of the learning disabled children, refused any further special services for her other child. There is no separate category or discrete assistance in the program for handicapped for learning difficulties arising from cultural, social, and economic deprivation. Sever-

---

1. The handicap category of Learning Disabled is specifically defined to exclude all students whose unsatisfactory performance is found to. be based upon social, economic, or cultural background as are all other categories of handicap with the exception of Emotionally Impaired. Rule 340.1713(13)(e).

al other plaintiffs have been referred for an evaluation of their eligibility but these referrals have not resulted in any classification or access to services. Plaintiffs do not contend that defendants harbor a racially discriminatory motive for these alleged acts and omissions.

The determination of eligibility for special education services or "labeling" is governed by Michigan Special Education Code Rules (hereinafter Rule) 340.1701 *et seq.* promulgated by the State Board of Education pursuant to M.C.L.A. § 380.1701 *et seq.* Commonly, a child will be referred to the special services department by his or her academic teacher for a comprehensive evaluation when that teacher's observations indicate that the child is unable to perform satisfactorily in class. Depending on the nature of the difficulty, the child may be evaluated through standardized tests and interviews by a teacher/consultant, social worker, school psychologist, or even a special diagnostic consultant. Subsequently an "Educational Planning and Placement Committee" (hereinafter EPPC) meeting is held to assess the various evaluations and to recommend a course of action. Rule 340.-1701 requires that a representative of the administrative personnel, instructional personnel, diagnostic personnel, and parents of the child involved be in attendance at the EPPC meeting. Furthermore, notice is required to be given to the parent prior to a change in a student's educational status. Rule 340.1723. In the event that a student's parents are not satisfied with the action taken by the EPPC they are entitled to seek administrative review of the decision. Rule 340.1725. Each plaintiff who has received special education services was evaluated and declared eligible for receipt of those services in accordance with the procedures described above. None of the EPPC recommendations pertaining to these children were appealed.

### Equal Protection and Civil Rights

From the allegations contained in the complaint it can be deduced with great difficulty that two interrelated theories underlie all of plaintiffs' claims under the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 1985(3). The evaluation procedures employed by the defendants, pursuant to the requirements of the Michigan Special Education Code Rules, are designed to identify children with handicaps. The Rules do not require and defendants do not provide special educational services for children whose learning difficulties are caused solely by cultural, social, and economic deprivation. Plaintiffs allege that both the application of defendants' evaluation and special education procedures and the failure of defendants to provide special education services for nonhandicapped children suffering from cultural, social, and economic deprivation creates two sets of classes of students at King School for purposes of equal protection analysis. The composition of these classes varies slightly with the theory being urged by plaintiffs.

### 1. *Theory of Equal Educational Opportunity*

According to what will be referred to as the theory of equal educational opportunity the defendants' evaluation procedures and special education services which concentrate only on students with learning difficulties caused by handicaps are alleged to create one class composed of all students with learning difficulties who are not culturally, socially, and economically deprived and another class of all students with learning difficulties who are culturally, socially, and economically deprived, i. e., plaintiffs. The defendants' program is claimed to violate plaintiffs' right to equal protection of the laws and their civil rights under 42 U.S.C. §§ 1983 and 1985(3) because it denies special education services to children whose unsatisfactory academic performance is based on their cultural, social, or economic backgrounds and yet provides such services for children whose unsatisfactory academic performance is based on handicaps.

No law or clause of the Constitution of the United States explicitly secures the right of plaintiffs to special education services to overcome unsatisfactory academic performance based on cultural, social, or economic background. For purposes of an

equal protection analysis plaintiffs are not a suspect class. Furthermore, plaintiffs have not identified a fundamental interest which is being infringed by defendants' activities. Education, as important as it may be, has been held not to be a fundamental interest. *San Antonio Independent School District et al. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972). Therefore, to properly allege a violation of the right to equal protection of the laws plaintiffs must allege that the actions of defendants are not rationally related to a legitimate state purpose.

However, plaintiffs have only alleged that defendants do not provide special education for children whose unsatisfactory academic performance is alleged to be caused by their cultural, social, or economic background. In essence this is a challenge to a limitation put on a measure designed to remedy a problem. It is a challenge to an effort to do good because the remedy adopted did not do good to all. As stated by Justice Brennan in *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), with reference to a federal law which did not restrict or deny the franchise but extended the franchise to persons to whom it would otherwise have been denied by state law:

> In deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' . . . that a legislature need not 'strike at all evils at the same time,' . . . and that 're-form may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' . . .

Id. at 656–657, 86 S.Ct. at 1727. *See Deal v. Cincinnati Board of Education*, 369 F.2d 55, 59–60 (6th Cir. 1966), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1969). Plaintiffs' theory of equal educational opportunity does not state a claim upon which relief can be granted either pursuant to the Fourteenth Amendment or to 42 U.S.C. §§ 1983 and 1985(3).

## 2. Theory of Stigmatization of Defendants

According to what will be referred to as the theory of stigmatization the defendants' evaluation procedures and special education services are alleged to create one class composed of all non-handicapped students who are not culturally, socially, and economically deprived and another class composed of all non-handicapped students who are culturally, socially, and economically deprived, i. e., plaintiffs. The acts complained of are claimed to violate plaintiffs' right to equal protection of the laws because they incorrectly stigmatize plaintiffs as handicapped not only by labeling them but by singling them out from the student body for special treatment. This stigmatization is considered especially grievous in light of the public policy expressed in the Michigan Special Education Code Rules that students whose unsatisfactory scholastic performance is found to be based upon cultural, social, or economic background are not to be considered as handicapped under any category with the possible exception of Emotionally Impaired.

No law or clause of the Constitution of the United States explicitly secures the right to be free from the type of stigmatization alleged. Plaintiffs do not identify themselves as a suspect class for purposes of equal protection analysis. Although plaintiffs all happen to be black the characteristics alleged to identify them as a class are that they are culturally, socially, and economically deprived and are not handicapped. Plaintiffs also do not identify a fundamental interest which is being infringed. Education has been held not to be a fundamental interest. *Rodriguez, supra.* Therefore, to properly allege a violation of the right to equal protection of the laws plaintiffs must allege that the diagnostic evaluations and special education undertaken by defendants under color of state law are not rationally related to the legitimate purpose of identifying and assisting handicapped children. *See Rodriguez, supra*, 411 U.S. at 54–55, 93 S.Ct. 1278.

However, plaintiffs have only alleged that defendants failed to distinguish between learning difficulties caused by cultural, social, and economic deprivation and learning difficulties caused by handicaps, as that word is used in the state statutes, in the process of identifying those students with handicaps. This failure, it is claimed, erroneously includes non-handicapped culturally, socially, and economically deprived students as handicapped. In essence this is an allegation that the class created through the defendants' administration of a special education program for handicapped children is overinclusive. Although this allegation may or may not state a claim for violation of Michigan Special Education Code Rules it does not lead to the conclusion that the procedures employed by defendants are not rationally related to the purpose of assisting handicapped students. On the contrary, the EPPC minutes contained in the appendix to plaintiffs' complaint strongly leads to the inference that defendants' procedures are rationally related to their declared purpose. As stated by Justice Marshall in *Rodriguez, supra* at 5, 93 S.Ct. at 1306.

> [T]he existence of 'some inequality' in the manner which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system. *McGowan v. Maryland*, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961). It may not be condemned simply because it imperfectly effectuates the State's goals. *Dandridge v. Williams*, 397 U.S. [471,] at 485, 90 S.Ct. at 1161 [25 L.Ed.2d 491]. Nor must the financing system fail because, as appellees suggest, other methods of satisfying the State's interest, which occasion 'less drastic' disparities in expenditures, might be conceived.

Plaintiffs do not even allege that special education experts have the knowledge or expertise which would enable them accurately to make the distinction between cultural, social, and economic deprivation and handicaps. Furthermore, the EPPC minutes suggest that, contrary to plaintiffs' conclusory allegation, defendants did consider the factor of cultural, social, and economic deprivation and attempted to distinguish such students from students with handicaps.

For these reasons plaintiffs' stigmatization theory does not state a claim upon which relief can be granted either under the Fourteenth Amendment or under 42 U.S.C. §§ 1983 and 1985(3).

█ Plaintiffs proceed under this stigmatization theory again to attack the constitutionality of M.C.L.A. § 380.1146 which states:

> A separate school or department shall not be kept for a person on account of race, color, or sex. This section shall not be construed to prevent the grading of schools according to the intellectual progress of the pupil to be taught in separate places as may be deemed expedient.

Plaintiffs claim that since they are all black and since M.C.L.A. § 380.1146 permits them to be taught separately from economically advantaged students in the regular education program at King School, thereby stigmatizing plaintiffs, the statute permits unconstitutional discriminatory tracking. Since the stigmatization of plaintiffs as alleged in the complaint does not constitute a violation of the Fourteenth Amendment or 42 U.S.C. §§ 1983 and 1985(3) the state statute which permits such stigmatization to occur does not, by virtue of that permission, violate the constitution.

In support of their stigmatization theory plaintiffs cite the cases of *Hobson v. Hanson*, 269 F.Supp. 401 (D.D.C.1967), *aff'd Smuck v. Hobson*, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969); *Larry P. v. Riles*, 343 F.Supp. 1306 (N.D.Calif.1972), *aff'd*, 502 F.2d 963 (9th Cir. 1974); *Board of Education of Cincinnati v. H.E.W.*, 396 F.Supp. 203 (S.D.Ohio 1975); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745. (1977). In *Hobson*, unlike the present case, the court found that the District of Columbia School System was discriminating against both black and poor persons. In *Larry P.* plaintiffs alleged that there was no rational relationship between the tests used by the school authorities to identify

mentally retarded persons and the goals of the special education classes for the mentally retarded which had a disproportionately high percentage of blacks enrolled. *Board of Education of Cincinnati* involved a challenge to HEW's determination that plaintiff was ineligible for Emergency School Aid Act funds which were sought to enable emergency desegregation of a school system. In *Milliken* the Court approved a portion of the desegregation remedy involving special speech training. Each of these cases is distinguishable from the present case in the critical respect that they involved racial discrimination, a suspect classification.

*Equal Educational Opportunity*

In count III of the complaint plaintiffs allege that the defendants' previously described acts and omissions constitute a failure to take appropriate action to overcome language barriers in violation of 20 U.S.C. §§ 1703(f) and 1706.[2] Section 1703(f) of Title 20 of the United States Code states:

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

Plaintiffs assert that as a class of black economically disadvantaged children living in the social isolation of a housing project they speak a vernacular of English, referred to as "Black English", which is so different from the English commonly spoken in the public schools as to constitute a

language barrier which impedes their equal participation in King School's instructional programs.

In their attack on the legal sufficiency of this claim defendants present two issues for resolution. The first issue is whether the existence of a dual school system is prerequisite to the finding of a denial of equal educational opportunity under section 1703(f). The second issue is whether the term "language barrier" can be interpreted to include a child's inability to use standard English effectively because that child's native language is what plaintiffs have termed "Black English" as opposed to a foreign language such as Spanish.

1. *Dual School System Argument*

The Equal Educational Opportunities Act of 1974 originated as a message from President Nixon to Congress on school busing. 118 Cong.Rec. 8928 (1972).[3] The President's proposal proceeded on a frequently stated presumption that "[t]he years since *Brown v. Board of Education* have been ones of dismantling the old dual school system in these areas where it existed—a process that has now been substantially completed." Given this presumption the President wanted to shift the focus of efforts to achieve racial equality from more busing to better education. 118 Cong.Rec. 8929 (1972). To achieve this shift the President's proposal was designed "to give the courts a new and broader base on which to decide future cases and to place the emphasis where it belongs: on better education for all our children" and to set forth alternatives to the busing remedy. 118 Cong.Rec. 8931

2. Section 1706 of Title 20 of the United States Code states:

An individual denied an equal educational opportunity, as defined by this subchapter may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate. . . .

3. In 1974, during House debate on HR 69, a bill to extend and amend the Elementary and Secondary Education Act of 1965, Representative Esch proposed an amendment identical in relevant portions with the Equal Educational Opportunities Act of 1974 (hereinafter EEOA). 20

U.S.C. § 1701 *et seq.* This amendment was passed by the House but defeated in the Senate in 1972. The amendment was adopted and after modifications in the Senate, not relevant to this discussion, the EEOA was enacted into law. As a result there were no committee hearings conducted on the measure during the 93d session of Congress. 1974 U.S.Code Congress. 1974 U.S.Code Cong. & Admin.News p. 4206. However, there were extensive hearings held on the EEOA in 1972. The legislative deliberations on this measure in 1972 form the basis for the discussion of legislative history in this opinion.

(1972). The essence of what is now 20 U.S.C. § 1703 was then the President's definition of the denial of equal educational opportunity which constituted the "broader base on which to decide future cases." The President described this broader base as setting "standards for all school districts throughout the Nation, as the basic requirements for carrying out, in the field of public education, the Constitutional guarantee that each person shall have equal protection of the laws." 118 Cong.Rec. 8931 (1972).

From these remarks it appears that the President was proposing legislation which would not merely shift the focus of the courts from busing to other remedies for racially segregated "dual school systems" but which would actually create statutory definitions of equal educational opportunity broader than the standards thus far formulated by the courts when interpreting the equal protection clause of the Fourteenth Amendment. In a sense these statutory standards would constitute a new definition of dual school system.

The theme of this message to Congress is reflected both in the report of the Committee on Education and Labor which recommended passage of the bill and in the language and structure of the Act itself. The Committee on Education and Labor, which reported on the Equal Educational Opportunities Act of 1972 bill to the House of Representatives with the recommendation that it pass, stated:

> [T]o assist in that final elimination [of de jure segregation] the committee bill for the first time in Federal Law contains an illustrative definition of denial of equal educational opportunity. It is the purpose of that definition . . . to provide school and governmental authorities with a clear delineation of their responsibilities to their students and employees and to provide the students and employees with the means to achieve enforcement of their rights.

H.R.Rep.No.1335, 92d Cong., 2d Sess. 3 (1972). The illustrative definition to which the committee report refers is Title II of the EEOA which defines unlawful practices including the failure to eliminate language barriers. 20 U.S.C. § 1703(f). Furthermore, Section 1701 of Title 20 of the United States Code, the policy and purpose section of the EEOA, states in pertinent part:

> (a) The Congress declares it to be the policy of the United States that—
>
> (1) all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin . . .

This language confirms that the expansive definitions of equal educational opportunity are a matter of policy and not merely questionable restatements of preexisting case law on equal protection.

Most of the cases interpreting 20 U.S.C. § 1701 et seq., are desegregation cases in which no consideration whatsoever is given to whether the existence of a dual school system is a prerequisite to the enforcement of rights established under § 1703. There are, however, two cases which provide support for the proposition that the existence of a dual school system is not a prerequisite. In *U. S. v. Hinds County School Board et al.*, 560 F.2d 619 (5th Cir. 1977) the court held that a sex segregated school assignment violated § 1703(a). Although the Hinds County School Board had previously been found to operate a dual school system with respect to blacks, no discrimination had ever been alleged to exist with respect to women. The court pointed out that in 20 U.S.C. § 1703 Congress went "beyond the acts and practices proscribed prior to the EEOA's passage and [guaranteed] additional rights to public school children." *Hinds, supra* at 624.

In *Evans v. Buchanan et al.*, 416 F.Supp. 328 (D.Del.1976), the court granted a motion to intervene brought by Hispanics who sought to protect their bilingual program from being eliminated in a court ordered desegregation plan aimed at black-white segregation. No discrimination with respect to Hispanics had been alleged in that case. The court held that the Hispanic intervenor's right to a bilingual program was protected by 20 U.S.C. § 1703(f).

Given the nature of the legislative history and the language and structure of the statute itself it does not appear that the exist-

ence of a dual school system, in the sense that term has heretofore been used by courts to denote a school system which is racially segregated in violation of the Fourteenth Amendment, is prerequisite to a finding that a provision of the EEOA of 1974 has been violated.

### 2. *No Foreign Language Barrier Argument*

■ Federal Courts have not explicitly addressed the issue of whether the language barrier specified in § 1703(f) must be a foreign language barrier or may also include the barrier standard English presents to a black child with a "Black English" background. Section 1703(f) states only that

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

This section (f) requires a showing of two things. (1) The denial of educational opportunity must be on "account of" race, color, sex or national origin and, (2) the educational agency must fail to take action to overcome language barriers that are sufficiently severe so as to impede a student's equal participation in instructional programs. So the allegations in this case must be examined to determine the seriousness of the language barriers and the cause of the alleged denial of educational opportunities that results from the failure to take action to overcome the language barriers.

The statutory language places no limitation on the character or source of the language barrier except that it must be serious enough to "impede equal participation by . . . students in . . . instructional programs." Barring any more explicit legislative guidance to the contrary § 1703(f) applies to language barriers of appropriate severity encountered by students who speak "Black English" as well as to language barriers encountered by students who speak German.

The legislative history of this section does not provide a meaning more specific or limited in scope than the language of the statute. In his message to Congress President Nixon stated:

School authorities must take appropriate action to overcome *whatever* language barriers might exist, in order to enable all students to participate equally in educational programs. This would establish, in effect, an educational bill of rights for Mexican-Americans, Puerto Ricans, Indians and others who start under language handicaps, and ensure at last that they too would have equal opportunity. [Emphasis added].

118 Cong.Rec. 8931 (1972). The President's list of persons covered by his proposal is not only merely illustrative but could well include students whose "language barrier" results from the use of some type of non-standard English. The report of the House Committee on Education and Labor simply paraphrases the statutory language and commends HEW for having initiated a compliance review of school districts throughout the country to ascertain whether they have fulfilled their obligation to remove language and cultural barriers under Title VI of the Civil Rights Act of 1964. H.R. Rep.No.1335, 92d Cong., 2d Sess. 6 (1972).

Paragraph 120 of the complaint contains an allegation that plaintiffs are all Black and economically disadvantaged and that the defendants have failed to take appropriate action to overcome language barriers. There is enough stated implicitly in this allegation as to causation to prevent this court from granting a motion to dismiss. In keeping with the terms of the statute this court holds that allegations of failure by an educational agency to take appropriate action to overcome language barriers of students which impede their equal participation in instructional programs when tied, as alleged, to race allege a violation of 20 U.S.C. § 1703(f). Defendants' motion to dismiss plaintiffs claim under 20 U.S.C. § 1703(f) in count III of their complaint is denied.

*Benefits of Federal Financial Assistance*

Plaintiffs' fourth cause of action is based on 42 U.S.C. § 2000d which provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

In paragraph 123 of their complaint Plaintiffs state:

They specifically are being denied numerous benefits under Title 20 of the United States Code, *because they are at a school where too few economically disadvantage children attended* to warrant the provision of special programs to service these named plaintiff children . . . (Emphasis added.)

The statute provides that no person shall be denied benefits on the ground of race, color or national origin. Plaintiffs allege that they are being denied benefits because there are too few economically disadvantaged students at King School. Even assuming that benefits were being denied, plaintiffs' allegation fails to state a claim under 42 U.S.C. § 2000d since they have failed to allege that the benefits were being denied on the grounds prohibited by 42 U.S.C. § 2000d. Furthermore, plaintiffs' allegations relative to language barriers are adequately addressed under Plaintiffs' third alleged cause of action. Therefore, Plaintiffs' fourth cause of action is dismissed for failure to state a claim upon which relief may be granted.

*Free Education*

In count V of the complaint plaintiffs claim that their right to a free education, guaranteed by Article 8, Section 2 of the Michigan Constitution and M.C.L.A. § 380.1147(1), has been violated to the extent that defendants have failed to provide appropriate special education services thus allowing plaintiffs to become illiterate. Article 8, Section 2 of the Michigan Constitution states:

The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law

· · ·

Section 380.1147(1) of Michigan Compiled Laws Annotated states:

(1) A person, resident of a school district not maintaining a kindergarten and at least 5 years of age on the first day of enrollment of the school year, shall have a right to attend school in the district.

(2) In a school district where provision is made for kindergarten work, a child, resident of the district, is entitled to enroll in the kindergarten if the child is at least 5 years of age on December 1 of the school year of enrollment. In a school district which has semi annual promotions, a child, resident of the district, is entitled to enroll in kindergarten for the second semester if the child is at least 5 years of age on March 1 of the year of enrollment.

Plaintiffs claim their right to free education is violated since they are not getting books and materials relied upon by King School teachers to prepare other children, such as reading materials available in the homes of middle and higher income students. Plaintiffs also state that they are being denied equal educational opportunity under Michigan law. Article 8, Section 2 of the Michigan Constitution and M.C.L.A. § 380.1147(1) do not explicitly require that public school systems provide such special educational services for culturally, socially, and economically deprived students. Plaintiffs cite *Bond v. Ann Arbor School District,* 383 Mich. 693, 178 N.W.2d 484 (1970), in support of their proposition. The plaintiffs in *Bond* sought to have the Court declare book, materials, and activities fees collected by the Ann Arbor Public Schools violative of the Michigan Constitution, Art. 8, Sec. 2. The Court held that by applying either the "necessary elements of any school's activity" test or the "integral fundamental part of the elementary and secondary education" test, it was clear that books and school supplies were an essential part of a system of free public elementary

and secondary schools. *Bond, supra* at 702, 178 N.W.2d 484 at 487. A fair reading of this opinion indicates that the Court did not mean to include in its holding any materials which could possibly be useful in the educational process. They meant textbooks and supplies or equipment used in school.

The opinion in *Governor v. State Treasurer*, 390 Mich. 389, 212 N.W.2d 711 (1973), contains language which suggests not only that the Michigan Constitution does not mandate equal educational opportunity as claimed by plaintiffs but also that the scope of the Michigan equal protection clause tracks that of the federal constitution with the result that the defendants' failure to provide plaintiffs with compensatory services and their placement of plaintiffs in special education classes does not violate plaintiffs' Michigan equal protection rights just as those acts and omissions do not violate plaintiffs' federal equal protection rights. The Court stated:

> [T]he state's obligation to provide a system of public schools is not the same as the claimed obligation to provide equality of educational opportunity. Because of definitional difficulties and differences in educational philosophy and student ability, motivation, *background*, etc., no system of public schools can provide equality of educational opportunity in all its diverse dimensions. All that can properly be expected of the state is that it maintain and support a system of public schools that furnishes adequate educational services to all children. (Emphasis added)

*Governor, supra* at 406, 212 N.W.2d at 720. Furthermore the Court noted that in the past it had frequently held that the Michigan Constitution secures the same right of equal protection as the federal constitution. Although the Court expressly reserved the issue of whether education is a fundamental interest in Michigan the Court's views on equal educational opportunity strongly suggest that it would not be sympathetic to plaintiffs' claims. Given this posture of Michigan case law plaintiffs have failed to state a cause of action upon which relief can be granted.

### Tortious Abrogation of Constitutional Rights

Since plaintiffs' claims for violation of their various constitutional rights have all been dismissed for failure to state a claim upon which relief can be granted they cannot continue to maintain an action sounding in tort for willful or reckless violation of those rights by certain named defendants. Therefore, plaintiffs' sixth cause of action in tort against Hazel Turner and Rachel Schreiber and certain of their agents and employees for willful or reckless violation of plaintiffs' constitutional rights is dismissed for failure to state a claim upon which relief can be granted.

### Student Advocacy Center as Next Friend

The Ann Arbor defendants, pursuant to F.R.C.P. 9(a), have raised the issue of the capacity of the Student Advocacy Center to act as next friend to plaintiff school children. The capacity of a representative to sue is to be determined by the law of the state in which the district court is held under F.R.C.P. 17(c).[4] *Slade v. Louisiana Power & Light Co.*, 418 F.2d 125 (5th Cir. 1969). The Michigan rule, GCR, 1963, 201.-5(2) provides in pertinent part:

> Appointment of next friend . . . shall be made by the court: . . . (2) in the case of an infant party under the age of 14 years or an incompetent party, upon the nomination of the next of kin of such party . . . The court in its discretion may refuse to appoint any representative deemed unsuitable . . .

---

4. Rule 17(c) of the Federal Rules of Civil Procedure states:

    Infants or Incompetent Persons. Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian *ad litem*. The court shall appoint a guardian *ad litem* for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

The next of kin in this case are the mothers of the various plaintiffs who are also identified as next friend in the complaint. Michigan infants with living parents have sued through a non-parent next of friend appointed under this rule. In *Buckholz v. Leveille*, 37 Mich.App. 166, 194 N.W.2d 427 (1971), a 16 year old high school student was held to be entitled to bring suit attacking the constitutionality of a school dress code even though his parents agreed with the dress code and desired that the suit be dismissed. However, beyond the language of the rule, which by implication contemplates only one next friend, there are no cases which give guidance on the permissibility of multiple next friends.

Aside from the language of the rule there is an important reason for limiting the number of next friends to one individual or entity. The next friend is charged with the responsibility of representing an infant or incompetent person in a lawsuit. The existence of multiple next friends creates a potential for conflict of opinion and action which is a serious, if not overwhelming, impediment to the progress of a lawsuit and to responsible representation. For this reason Michigan G.C.R., 1963, 201.5(2) and F.R.C.P. 17(c) are held to authorize a court, in its discretion, to limit an appointment to only one next friend. In this case it appears most appropriate to permit the mother of each plaintiff school child to continue as next friend and to dismiss the Student Advocacy Center from the lawsuit as next friend. This holding does not in any way prevent the Student Advocacy Center from providing such assistance to plaintiffs as they desire to accept. It does, however, vest the ultimate responsibility for the representation of each plaintiff school child in one individual.

In summary, plaintiffs' claims for violation of their rights under the Fourteenth Amendment to the Constitution, 42 U.S.C. §§ 1983 and 1985(3), 42 U.S.C. § 2000d, Article 8, Section 2 of the Michigan Constitution, M.C.L.A. § 380.1147(1), and the common law are all dismissed for failure to state a claim upon which relief can be granted. In addition, the Student Advocacy Center is dismissed from this lawsuit as next friend since the rules authorizing appointment of next friends authorize the court, in its discretion, to limit an appointment to only one next friend. Defendants' motion to dismiss plaintiffs' claim for violation of their rights under 20 U.S.C. §§ 1703(f) and 1706 is denied.

So ordered.